[Civil No. 4189.   Filed November 18, 1940.]

[107 Pac. (2d) 224.]

DR. J. M. MEASON, Appellant, v. RALSTON PURINA COMPANY, a Corporation, and M. B. VAUGHT, Its Agent, Appellees.

292

Mr. Frank W. Beer, Mr. William G. Christy and Mr. Richard P. Meason, for Appellant.

Mr. Henry H. Miller, Mr. Laurens L. Henderson and Mr. Phil J. Munch, for Appellees.

McALISTER, J.—The Ralston Purina Company recovered judgment against Dr. J. M. Meason on three promissory notes executed by him in its favor and, from that judgment and an order denying his motion for a new trial, he appeals. The parties will be referred to throughout as plaintiff and defendant.

The facts out of which the action arose are substantially these: On May 1, 1936, the plaintiff, the Ralston Purina Company of St. Louis, Missouri, manufacturer and the defendant, Dr. J. M. Meason, of Chandler, Arizona, grower, entered into an agreement, termed a "turkey chow contract," by which the former agreed

to sell the latter turkey feed in the sum of $2,254 for approximately 2,000 turkeys being grown by him on a ranch about fifteen miles from Chandler, Arizona, and the latter agreed to purchase the feed and give his note bearing 6 per cent. interest for each lot received and secure the same with a first mortgage on all his turkeys and turkey equipment. The agreement provided that the grower would not move the turkeys from the ranch without manufacturer's permission, would use Purina products exclusively, be responsible for the cost of hauling the feed from manufacturer's warehouse in Phoenix to the ranch and pay the notes when due; that the liability of the grower was not dependent upon the sale of the turkeys but that the date for payment of the notes, in part or in full, should be advanced by any sale of turkeys and that if they were sold at various times the defendant would pay the plaintiff not less than two-thirds of the sale price received on those sold prior to the Thanksgiving market; that "Payments on the note shall be made out of the Thanksgiving and subsequent sales in such proportion as will insure that the notes will be paid in full when the last large lot of birds are sold, or on December 30, 1936, whichever event occurs first. Should the Grower sell any turkeys without making the required payment on account, the Manufacturer shall have the sale, and apply the proceeds, so far as they are needed, towards payment of the Grower's notes, and any balance remaining due the Manufacturer shall become payable immediately"; that the grower would allow the manufacturer, its agent or salesman, to inspect the turkeys at all reasonable times and furnish it reports as requested showing: (1) number and kind of turkeys on the ranch; (2) the condition, age and approximate weight of birds; (3) sales during month and price obtained; (4) losses during the month, and cause.

In fulfillment of this agreement, the plaintiff delivered to Dr. Meason on May 21, 1936, five hundred and forty-eight sacks of turkey feed and received from him his promissory note in its favor for $1,453.20, bearing that date and 6 per cent. interest, the same being payable on December 31, 1936, at the Ralston Purina Company's office in St. Louis. The only difference between this note and the other two was the date of execution and the amount due, the first of these two being for $1,292 and dated July 25, 1936, and the other for $984 and bearing date of November 5, 1936.

A chattel mortgage on the turkeys and turkey equipment securing the payment of the three notes was executed by Meason on July 8, 1936, and recorded on September 26 thereafter. The turkeys had been disposed of many months before this action was filed.

In addition to the foregoing facts the complaint alleges that a large number of turkeys were sold in November and December, 1936, and that the notes, totaling $3,729.20, became due and payable on December 31, 1936, under both the contract and their own terms, but that no part of this sum, except $950, had been paid, thus leaving due a balance of $2,779.20 in principal, interest, and an attorney's fee of 10 per cent. of the sum found due.

The answer admits the contract, the receipt of the feed, the execution of the notes and the chattel mortgage, but denies the sale of a large number of turkeys in November and December, 1936, that the notes became due on December 31, 1936, in the sum of $3,729.20, or any other sum, that there is in fact any balance whatever due thereon, or that defendant is liable at all on the notes for the following reason: In November, 1936, he owned 1,660 turkeys subject to the chattel mortgage held thereon by plaintiff; that when the mortgage was executed and at all times there-

after the parties understood and agreed that, notwithstanding the mortgage, the turkeys could be sold and marketed by defendant for the Thanksgiving and Christmas holiday seasons in 1936; that shortly prior to November 26, 1936, the defendant entered into a contract with the Phoenix Poultry & Egg Company whereby he agreed to deliver to that company the 1,660 turkeys on foot at his ranch, and in consideration thereof the company agreed to pay him an average of 19¢ per pound therefor, delivery to be made in time for the 1936 Thanksgiving market; that both parties were fully prepared to carry out this contract and would have done so, except for the fact that a few days after the Phoenix Poultry & Egg Company had, pursuant thereto, taken delivery of a portion of said turkeys, it sent to the defendant's ranch a large truck to pick up an additional portion thereof but that the plaintiff, through its agent, M. B. Vaught, with knowledge of the sale to which it had theretofore consented, maliciously, wilfully, intentionally, unlawfully and without right, just provocation or excuse, prevented "the consummation of said sale and the delivery and acceptance of the remaining portion of said turkeys thereunder, by wrongfully claiming title to said turkeys, and by wrongfully claiming the right to refuse permission to sell or remove said turkeys at said time, and by refusing to permit the removal or delivery of said turkeys, and by refusing to permit the said Phoenix Poultry & Egg Company to take delivery of said remaining turkeys, or any part of them."

The answer alleges further that at the price the Phoenix Poultry & Egg Company agreed to pay for the 1,660 turkeys they were worth the reasonable sum of $6,533.60 but that immediately after Thanksgiving the market price for turkeys dropped and, although defendant made a diligent effort to dispose of them at a fair price, he could not do so and was only able

to sell some of them in small allotments; that he was forced to have them dressed and placed in cold storage, as a result of which many of them became so spoiled and unfit for human consumption that he realized only $610.94, for all remaining unsold after Thanksgiving; that as a direct and proximate result of the aforesaid malicious, wilful, intentional, unlawful and unwarranted interference with the beneficial sale of the turkeys, defendant was forced to and did expend an additional sum of $501.50 for feed and storage for the turkeys and suffered actual damages in the sum of $6,444.15.

The defendant filed a cross-complaint against the plaintiff and its agent, M. B. Vaught, in which he set up the same facts alleged in the answer, and prayed for $6,444.15 actual, and $10,000 exemplary damages.

After both parties rested, plaintiff moved for a directed verdict for $3,607.75 in its favor on its complaint, and for one in favor of it and M. B. Vaught as cross-defendants on the cross-complaint. Both were granted, and it is the judgment entered upon these verdicts the defendant has brought here for review.

The principal assignment is that the court erred in directing these verdicts, for the reason that the evidence was sufficient to support the allegations of the answer and the cross-complaint and that consequently the case should have been submitted to the jury. The gist of the matter set up in both is that plaintiff, through its agent Vaught, wrongfully interfered with and prevented the carrying out and completion of the contract defendant had with the Phoenix Poultry & Egg Company for the sale of turkeys for the Thanksgiving market and that this action damaged him several thousand dollars. This contention is based upon the proposition that a contract is a property right and that a party to one has a cause of action against a

third person who procures its breach by the other party unless the acts of that third person are performed in the legitimate exercise of his own rights. 84 A. L. R. 43, annotation at page 55, and 62 C. J. 1444, paragraph 55. Whether the action of Vaught in connection with the completion of the contract for the sale of the turkeys interfered therewith and if so, whether it was justified, depends upon what he did in that respect.

The testimony in behalf of defendant discloses that early in November, 1936, the defendant agreed to sell and the Phoenix Poultry & Egg Company to buy, for 19¢ a pound all his turkeys that were ready for the Thanksgiving market, numbering about 1,300 or 1,400, practically an equal number of hens and toms, the former averaging in weight 12 to 14 pounds and the latter, 18 to 24. One hundred fifty or two hundred turkeys were delivered pursuant to this agreement soon after it was entered into, and some days later or about ten days prior to Thanksgiving the poultry company sent a large truck to the ranch for another allotment of turkeys but when it arrived Eldon Ellington, defendant's manager there, refused to deliver any because plaintiff's agent, Vaught, had been at the ranch earlier that day and told him that he could not sell any more turkeys, that the feed company had a mortgage on them, that he would have to send the trucks back empty and that defendant could get more money for them. A day or two after this Vaught appeared at the office of the Phoenix Poultry & Egg Company in Phoenix and informed its agent, William R. Randall, that the Purina Company had a mortgage on the turkeys and that anyone who bought them would get into trouble; that he had stopped the deal because he could get more for them and that there would be a better market for them Christmas time at Bisbee. The poultry company did not care to purchase mort-

gaged property, so it made no further effort to take delivery under the contract but bought turkeys elsewhere to fill its Thanksgiving orders.

It appears further that the defendant was unable to dispose of but a few of his turkeys at a fair figure, because after Thanksgiving the price dropped and at Christmas time it was no better—12¢ or 15¢ a pound; that the turkeys were in prime condition about Thanksgiving but soon thereafter refused to eat properly and began to go down, a number of them dying after the first of the year; that this rendered it necessary that about 600 of them be killed, dressed and placed in cold storage and sold for whatever price could be obtained for them; that he received so little for those he still had after the contract with the Phoenix Company was breached that he was able to pay out of the proceeds for the entire bunch only $950 on the notes, though, according to the testimony introduced by him, he would, if the sale had not been interfered with, have realized from them a sum much in excess of the amount of his obligation thereon.

The statements of Ellington and Randall were denied by Vaught who testified that he did not interfere in any way with the sale or delivery of turkeys to the Phoenix Poultry & Egg Company but merely advised against selling the hens, since only a small portion of those sold to that company were toms; that Meason could have sold them for whatever price he wanted to, for it was none of his nor plaintiff's business what was received for them, though he said he generally tried to help his feed customers find good markets for their turkeys and that he did so in this instance.

While the evidence on the question whether Vaught did in fact prevent or interfere with the sale of turkeys to the Phoenix Company is in conflict, plaintiff contends that that given by Ellington and Randall

shows that Vaught did not tortiously induce the Phoenix Company to breach its purchase contract with the defendant, for the reason that even though what he did had the effect of preventing the completion of the sale, he was at the time doing what he had a definite, legal right to do under the feed contract to protect his company's interest in the property. This is true, it is argued, because the feed agreement provided that defendant should "not move the turkeys from his ranch without the Manufacturer's permission" and section 4780, Revised Code of 1928, makes the transfer or sale of mortgaged personal property without first obtaining the mortgagee's consent a felony.

Defendant contends, however, that notwithstanding the foregoing provisions of the feed agreement and section 4780 the parties understood and the agreement considered as a whole shows that it was not necessary that special permission be obtained before an allotment of turkeys could be sold and delivered, and to support this he calls attention to the provisions of the agreement heretofore recited, laying special stress upon the provisions stating that if any turkeys were sold at various times the defendant should pay the plaintiff not less than two-thirds of the sale price of those sold before Thanksgiving, and that the grower should forward plaintiff reports as requested showing, among other things, the sales during the month and prices obtained. While the feed agreement does not say in specific language that sales could be made without permission being first obtained, we think a fair interpretation of it, viewed as a whole, is that it did give the mortgagee the right to stop a proposed sale in those instances in which its honest judgment led it to believe that the result would dissipate or jeopardize its security. In other words, the right was a qualified and not an absolute one. If, for instance, the sale was to an irresponsible party, or for

a price much below the market and its security, after the indebtedness should be reduced by the receipts applicable thereto under the contract, would be insufficient, the mortgagee's right to interfere would be clear. And this being true, Vaught was undoubtedly within his rights in keeping close watch on the turkeys sold in order that he could be sure that the sale was a fair one and that two-thirds of the receipts therefrom, or all of them in case the number being disposed of was sufficiently large to care for the entire feed bill, were applied on the notes, but this did not justify his interference with a contract of sale that had already been entered into and partially carried out, unless he honestly believed that the plaintiff's security would be weakened or become insufficient for any balance that might remain. Under these circumstances, therefore, it was clearly a jury question whether Vaught's interference with the sale was justified.

██ Plaintiff contends further that before defendant may maintain an action against it for inducing a breach malice towards him on the part of Vaught must appear as the gravaman of the action, and that since the evidence discloses that his motive in stopping the sale was to help defendant sell for a better price malice is not and cannot be shown. The malice required in actions for damages for wrongfully interfering with a contract does not necessarily imply spite or ill will but malice in its legal sense and by this is meant "the intentional doing of a wrongful act without justification or excuse." *Mangum Electric Co.* v. *Border,* 101 Okl. 64, 222 Pac. 1002, 1005. In *Sorenson* v. *Chevrolet Motor Co.,* 171 Minn. 260, 214 N. W. 754, 755, 84 A. L. R. 35, appears this language:

" 'The term "malice," as used in the class of cases mentioned, means nothing more than the intentional doing of a wrongful act without legal justification or

excuse, or otherwise stated the willful violation of a known right. Whether a wrongdoer's motive in interfering is to benefit himself, or to gratify his spite by working mischief to another, is immaterial, malice in the sense of ill will or spite not being essential.' ' '

█ It is also contended by plaintiff that the Phoenix Poultry & Egg Company was primarily liable for the breach and that, notwithstanding Vaught's interference and the mortgage, both parties to that contract could have performed and title to the turkeys under the feed agreement would have passed upon payment by defendant of a portion of the proceeds of the sale. The fact that they might have ignored the actions and statements of plaintiff's agent, if that be true, does not relieve the plaintiff from liability for Vaught's acts, if they were not justified and were such as to cause the Poultry & Egg Company to fear trouble if it bought and disposed of the mortgaged turkeys. Like anyone else it did not care to become involved in litigation and under the circumstances was not required to do so.

█ The contention that defendant's sole remedy was against the poultry company is without merit. The fact that he might have proceeded against it for breaching the contract does not mean that he did not have an action against plaintiff and Vaught for the tort of wrongfully inducing the breach. As said by the court in *Hornstein* v. *Podwitz*, 254 N. Y. 443, 173 N. E. 674, 675, 84 A. L. R. 1:

" . . . The fact that the plaintiff also has a cause of action against his principal for breach of contract does not prevent his having a cause of action in tort against them. They cannot be heard to say that they are not liable for their wrongful act because the owner of the premises is also liable to the plaintiff for his commissions.

"A recovery was permitted in each of the following cases against parties who had wrongfully induced a breach of contract, although in each case a cause of action for breach of contract existed in favor of the plaintiff against the other party to the contract. [Citing cases.]"

■■ One other reason urged by plaintiff in support of the order directing the verdict is that even though Vaught was guilty of "the intentional doing of a wrongful act without justification or excuse" the defendant waived such wrong by his subsequent conduct. By waiver is meant "a voluntary and intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right." *Southwest Cotton Co.* v. *Valley Bank*, 26 Ariz. 559, 227 Pac. 986, 988. It is contended that defendant was guilty of acts warranting such an inference by his conferring with Vaught after the breach as to the best method of managing the turkeys and the writing of several letters to plaintiff between January 7, 1937, and February 13 thereafter, expressing a willingness to pay the indebtedness from the sale of the turkeys and the hope that he would be able to do so. These acts do not necessarily show a waiver, for defendant had received the feed, executed the notes and was obligated to pay them, but this fact in no sense defeated or interfered with his right to seek recovery of damages from the plaintiff and Vaught for inducing the breach. He could have proceeded by way of counterclaim as he has in this case, or have paid the notes and filed an original action for the tort, and, this being true, his promise to pay the notes from the receipts from the turkeys was not inconsistent with his claim for damages for Vaught's tortious acts. It follows, therefore, that the case should have been submitted to the jury.

The judgment is reversed and cause remanded for a new trial.

ROSS, C. J., and LOCKWOOD, J., concur.