## CIRCUIT COURT OF LEE COUNTY

Roy Glen Watson,
Wallace Russell, and
Hershell Pennington

v.

Lee Bank & Trust Co.

May 7, 1982

Case No. 1890

By JUDGE S. W. COLEMAN, III

On October 3, 1980, a jury returned special verdicts for the plaintiffs, Roy Glen Watson and Wallace Russell, in the amounts of $75,000.00 each and for Hershell Pennington in the amount of $25,000.00 against the defendant, Lee Bank & Trust Company. The special verdicts were returned

following a trial which began on September 23, 1980. The specific factual and legal findings of the special verdicts were that Lee Bank & Trust Company did intentionally and with legal malice interfere with the plaintiffs in a contractual or business agreement which proximately caused damages to the plaintiffs and that such intentional acts of interference were not legally justified. The special verdict found no actual malice on behalf of Lee Bank & Trust. A separate special verdict was returned by the jury on a counterclaim filed by Lee Bank & Trust against Roy Glen Watson and Wallace Russell seeking to recover a deficiency judgment for the uncollected balance on a negotiable promissory note which was secured by a security agreement on certain equipment; the special verdict of the jury found that the balance owing on the promissory note was not legally collectible. Lee Bank & Trust seeks to set aside the verdicts in favor of the plaintiffs on their claim for tortious interference with a contractual or business relationship and further seeks to set aside the verdict on the counterclaim and have the court enter judgment in favor of Lee Bank & Trust for the amount claimed to be due on the promissory note from Roy Glen Watson and Wallace Russell or, in the alternative, to order a new trial on both issues pursuant to § 8.01-430 of the Code.

Based on well-established legal principles, the evidence must be viewed in the light most favorable to Roy Glen Watson, Wallace Russell, and Hershell Pennington. *Sexton v. Stroman,* 207 Va. 33, 147 S.E.2d 758 (1966); 13 Michie's Juris., *New Trials,* § 31, 658. The jury's verdicts must be considered to have resolved all factual disputes in favor of the plaintiffs and counter-defendants. There was considerable dispute in the evidence as to whether and to what extent the agents and officers of Lee Bank & Trust either made suggestions or demands of the plaintiffs as to the course of contractual or business relations to follow which was the basis for their claim. Any factual summary by the court will adopt the view most favorable to the plaintiffs and counter-defendants.

The motion to set aside the verdicts in this case warrants the closest scrutiny of the court because of the very significant impact the result will have, not only upon the parties to this litigation who have a signifi-

cant financial interest at stake, but upon parties to other secured transactions. Situations similar to the case at bar arise daily in the commercial community, in one form or another, and the ultimate decision will necessarily define the scope and extent to which a secured party may go after default in dictating the business arrangement in which the secured collateral may continue to be used without foreclosure, as well as the rights of the defaulting debtors to freely and voluntarily enter contractual or business relations of his own choosing. Basically, the plaintiffs claim that Lee Bank & Trust Company, which was a secured party as to Roy Glen Watson and Wallace Russell, tortiously interfered with their contract or business arrangement with Hershell Pennington to lease and mine coal by using the secured position of the Bank to force two of the plaintiffs into entering a business arrangement with persons other than Hershell Pennington and under terms dictated by Lee Bank & Trust Company.

### Factual Summary

The pertinent factual chronology is that in the early months of 1975, Roy Glen Watson and Wallace Russell desired to purchase a continuous miner and other equipment in order to begin a coal mining operation. They had located a coal lease at Child's Creek Coal Company in Harlan County, Kentucky, and a continuous miner to be purchased from Curtis Flanary located at Kem Gen Coal Company, a partnership owned by Dean Jones and Henry Turner. The principal of Child's Creek Coal Company was Curtis Flanary who was at the time the son-in-law of Henry Turner. Henry Turner was a member of the Board of Directors of Lee Bank & Trust Company. In order to finance the undertaking, Watson and Russell required approximately $264,000.00 capital of which Lee Bank & Trust Company was to loan $219,501.12. On May 17, 1975, Roy Glen Watson and Wallace Russell and their wives executed a promissory note payable to Lee Bank & Trust Company in the principal sum with interest and finance charges computed of $219,501.12, repayable in twenty-four monthly installments of $9,145.58, the first payment being due June 17, 1975. The promissory note provided for an assignment and transfer of the A20 P. J. Wilcox Continuous Miner Serial # 515 and its accesso-

ries and superstructure to Lee Bank & Trust Company to secure payment of the promissory note. Simultaneously with the execution of the promissory note, Watson and Russell executed additional security agreements consisting of an assignment of their inventory and receivables and equipment and consumer goods and certain interests in real estate to Lee Bank & Trust Company. In the security agreements, the debtors warranted that the secured property would be kept at Child's Creek, Kentucky.

The June, 1975, payment of $9,145.88 to the Bank was made by Watson and Russell, but thereafter, the debtors defaulted in all payments until making a partial payment on September 11, 1975, of $1,042.23. On December 20, 1975, a payment of $7,011.15 was credited to the account, and on January 9, 1976, and February 17, 1976, credits of $9,145.88 each were made against the account. These latter payments were made at a time that the mining operation had been reorganized and embrace the business arrangement that will later be described in more detail, which is the basis of the plaintiffs' claim. Further, in May of 1976, a $5,000.00 debit was added to the account for insurance premiums paid by Lee Bank & Trust Company to keep the miner insured in accordance with the agreement by the debtors. The debtors contended at trial that there was a "set-up" agreement with the Bank after the original default, in which the Bank agreed to defer the payment of principal if the interest payments were kept current, thus, placing the debtors not in the position of a defaulting party; however, the court ruled that as of July, 1975, the debtors were in default by failing to make their monthly payments and so continued up until the time of trial. Several demands were made by the Bank for the debtors to bring their payments current. During the period of default, representatives of the Bank met with the debtors to review their mining operation to determine the prospects of whether the business could meet the loan obligations. Various negotiations took place between June and September of 1975 in which the debtors were attempting to either sell the operation or have others come into the venture with additional capital to continue operation.

From the outset, the mining operation at Child's Creek encountered problems. Persons with coal mining expertise testified that this particular mine was not suitable

for mining with a continuous miner. After several months of unsuccessful operation, in August of 1975, the plaintiffs continued searching for viable alternatives, including looking for a different location for their continuous miner in order to operate another mining operation. Several prospects were approached with a view toward selling the lease and continuous miner. There had been discussion between Watson and Russell and Bank officials about bringing other persons more experienced in coal mining into the operation, but no details had been agreed upon. In late August or early September, Watson and Russell approached Hershell Pennington with the prospect of a joint coal mining venture in which Watson and Russell would invest their coal mining equipment on which there was the outstanding security agreements and Pennington was to invest his coal lease to certain property located on Mill Creek at Cranks Creek, Kentucky, in Harlan County. On September 9, 1975, Hershell Pennington acquired a coal lease from one Paul Garrett to forty-two acres of coal property located on Mill Creek at Cranks Creek, Kentucky, and the continuous miner was moved to that location. The evidence was in conflict as to whether Sonny Martin, a representative of the Bank, knew that the miner had been moved from Child's Creek to Mill Creek in violation of the terms of the security agreement; the verdict must resolve that conflict favorably to plaintiffs; however, there was no evidence from which one can conclude that moving the secured property had been authorized by the Board of Directors of the Bank. Watson, Russell and Pennington began the initial steps of "facing-up" for their new mining operation at Mill Creek and had employed one Ott Taylor to run the mine. Each of the plaintiffs were to work at the mine and receive wages for their employment. When the business arrangement between Watson, Russell and Pennington was revealed to the officials of the Bank in mid-September, Sonny Martin sent a memorandum to the Board of Directors of Lee Bank & Trust stating that the miner had been moved from its designated location in violation of the security agreement. The debtors were again notified of their default and were requested to bring their payments current. Representatives of the Bank were dispatched to Mill Creek to attempt to peaceably repossess the continuous miner but were unable to do so because of intervention by Hershell Pennington

who was asserting an interest in the miner because of his agreement with Watson and Russell and because of considerable expense he had incurred in repairing and moving the miner and "facing-up" the mine.

As to what transpired thereafter, there is considerable conflict in the evidence as to the role the agents and officials of the Bank played in causing the plaintiffs to enter into the ensuing business relation. In summary, the Bank indicates that for various reasons they determined that the arrangement between Watson, Russell and Pennington had already proven to be insufficient to protect their collateral in which they had a substantial financial interest and that the venture did not appear adequate to pay the already past due obligation. It appears that the Bank also objected to the involvement of Hershell Pennington in the venture. Nevertheless, the Bank indicates that they merely suggested to Watson and Russell that they should bring others into their operation who were more experienced coal operators and, once an acceptable arrangement had been negotiated, such could be presented to the Bank in order for the Bank to determine whether to further forbear on the delinquent obligation. The Bank indicates that the debtors had the discretion as to what arrangements were to be negotiated subject to approval by the Board of Directors as to whether such would justify further forbearance. Watson and Russell contend, on the other hand, that the officials of the Bank specifically dictated with whom and how the new coal mining venture would be permitted to continue operation without foreclosure. As previously indicated, these critical conflicts in evidence have been resolved by the jury verdict in the light most favorable to the plaintiffs, Watson, Russell and Pennington.

From the plaintiff's perspective, the evidence reveals that the Bank officials advised the plaintiffs that foreclosure would be deferred and the venture could continue at Mill Creek if others who were more experienced in coal mining were brought in and assumed the responsibility of operating the mine. The plaintiffs indicate that they, on their own initiative, contacted the Sergents with the prospects of becoming involved, but that the Bank had strongly urged that Ben Sergent and other members of his family be approached. As to who dictated the terms of

the reorganization, the record is not clear; however, the plaintiffs contend they had little or no input into the matter. Watson indicated that the details of the agreement must have been negotiated at a three-hour meeting between Bank officials and Birg Sergent in which Watson complains that he accompanied Sergent to the Bank but was not permitted to participate in the meeting. Since the Sergents were to assume the operation of the venture, it appears that they would have had considerable influence on the structure of the new venture subject to approval by the Bank and the plaintiffs. The record suggests and the jury could conclude that there may have been and probably were terms agreed upon between Bank officials and the Sergents as to the particulars of restructuring the mining operation. Nevertheless, the result was that during early November, 1975, a corporation, Princess Anne Coal Co., Inc., was formed to which all mining equipment of Watson and Russell was to be transferred, Hershell Pennington was to assign his lease for forty-two acres from Paul Garrett, Ben Sergent, Jr., was to execute a lease for adjoining coal property which he held, and Ben Sergent, Jr., Ben F. Sergent, III, and Birg E. Sergent were to bring the delinquent note current in the amount of $30,000.00 and to make additional contributions to capital with the total initial contribution not to exceed $40,000.00. In exchange for the foregoing contributions to capital, each person was to receive designated shares of stock which were to be pledged to Lee Bank & Trust Company pursuant to a voting Trust Agreement, which apparently was never memorialized. Each of the Sergents was to serve on the Board of Directors along with a person designated by the Bank. Sil Evans was to be employed to manage the mine, and Hershell Pennington, Glen Watson and Wallace Russell were to be employed by the corporation. Although with some minor deviations, substantially all the terms of the agreement were complied with except the loan was never brought current, although substantial payments were made. In November of 1975, Princess Anne Coal Company began mining operations at Mill Creek. In late 1975 or early 1976, Russell left the employment of Princess Anne Coal Company, and neither he nor Watson were, after the reorganization, involved in the management of the Company. In April and May of 1976, it became apparent

that Princess Anne Coal Company was unable to meet the prior obligations which it had assumed and, according to a Bank memorandum (Exhibit 33), Birg Sergent advised the Bank to repossess the continuous miner. On April 21, 1976, additional notices were sent by the Bank to Watson and Russell requesting payment of the past due amount of $192,063.48. Watson also left the employment of Princess Anne and upon doing so he executed a bill of sale along with Wallace Russell to Princess Anne on April 11, 1976, for their interest in the continuous miner in accordance with the reorganization agreement. On that same date, Wallace Russell executed an assignment of his stock certificate in Princess Anne to Lee Bank & Trust in accordance with the prior agreement. Both Watson and Russell testified that they thought the reorganization agreement released them from any further liability on their initial obligation, however, there was no action by the Bank or any written agreement which ever relieved them personally of that obligation. Princess Anne ceased operations in late April or early May, 1976.

Thereafter, the Bank had to take legal action in Harlan County, Kentucky, in September of 1976 to effect repossession of the continuous miner. A hole had been shot through the transformer, and it did not appear the repossession could be peaceably effected. At the Kentucky court sale, the Bank bid $5,000.00 for the continuous miner. The record did not indicate that either Watson or Russell had notice of the court sale. The Bank returned the continuous miner to Virginia and, after expending $6,268.31 in repair and repossession costs, sold the miner for $90,000.00 crediting the entire sum without deductions for repair or repossession expenses incurred against the balance then due. Watson and Russell were not given notice of the date or time of resale by the Bank. Thereafter, further demand was made against Watson and Russell for the deficiency balance of $107,063.48 with interest. No payments were made, and in December of 1978, Watson, Russell and Pennington filed their motion for judgment claiming tortious interference with their contractual or business relationship. The Bank counter-claimed for the balance due on the promissory note.

The evidence offered by the plaintiffs to prove damages consisted primarily of the evidence of Ott Taylor, a cer-

tified mine foreman, who had been employed to operate the mine by Watson, Russell and Pennington. Taylor had approximately twenty years' mining experience and considerable experience in working with a Wilcox continuous miner. He had obtained the necessary permits and maps to begin mining after Hershell Pennington had completed his "facing-up" for the mine. Taylor testified that the coal was the No. 1 Seam which is a good grade of coal based on an analysis which considers its BTU factor and ash, sulphur and moisture content. He indicated that at the time there were several buyers on the "spot market" for the coal at a price of between $26 to $28 per ton. He further projected that with ten men working two shifts per day that he could produce between 250 to 400 tons of coal per shift yielding a net profit of $12 to $14 per ton. He acknowledged that such was a projection and that there was always a risk and gamble involved in such a coal mining venture. Birg Sergent, on the other hand, testified that, after Princess Anne got into operation at Mill Creek, problems occurred immediately which adversely affected the profit picture. Initially, they thought to be mining in Blue Gem coal, a good quality coal which would have brought $40 per ton on the retail market or $20 to $30 per ton at the stoker mill, and there was great demand for this quality coal. Sergent testified that after selling the first production, the reports came back that the coal was not of a high quality because the ash content was 20% and sulphur content was too high. He testified that there was little market for such coal at the time unless it could be mixed with other coal or could be washed, which diminished its value and marketability. Sergent indicated that the quality was better described as the No. 2 Seam. Additionally, problems were encountered with the mine roof which required bolting, which added expense and slowed production. Glen Watson had borrowed a roof bolter to meet this added problem. Water problems were encountered in the mine that further slowed production. Sergent testified that they had no place to stockpile coal, and hauling and marketing the coal raised further problems. Sergent indicated that in April of 1976 with the coal strike ending that demand for this type coal would be further depressed and that it had become apparent that the mine would close and the corporation dissolve.

Further evidence as to damages was offered by both Watson and Russell. Each testified, without objection, as to many personal losses which each had sustained as a result of the business failure, which each alleges to have been precipitated by wrongful interference by the Bank. Russell testified to losing $29,000.00 on the sale of his house, $2,500.00 moving expense, $41,000.00 initial investment borrowed from Browning Wynn, $15,000.00 on trucks and $22,000.00 in lost wages. Watson testified to losing $41,000.00 and $26,000.00 initial investments, $16,000.00 loss in hauling between August, 1975, and November, 1975, $38,000.00 for loss of trucks, $100,000.00 for one-half interest in miner, $166,000.00 for coal lease and his credit being destroyed. Hershell Pennington testified to losing $3,500.00 for the coal lease he purchased, plus "a couple hundred thousand" for anticipated profits from the mine, and his cost and expense in "facing-up" the mine.

As to the counterclaim asserted by the Bank for the deficiency on the note, the record indicates that at the time of repossession and resale of the miner that Wallace Russell was working in South Carolina and Glen Watson was in Lee County, Virginia. The record indicates that the Bank notified the debtors that a deficiency claim was being asserted, but the debtors were not notified of the date, time or terms of the repossession resales.

### Legal Issues

At the risk of over-simplification, the basic issue presented by the plaintiffs is that the Bank acting by and through its agents intentionally induced or caused with legal malice Watson, Russell and Pennington not to enter into a contractual or business relationship which proximately resulted in financial loss or damage to the plaintiffs. The defendant Bank asserts that the facts do not, as a matter of law, constitute intentional interference with a business relationship but, even if so, the conduct was predicated upon sufficient financial interest of the Bank to render such acts legally justifiable or privileged.

The tort of intentional interference with a contractual or business relationship is a well-recognized cause of

action in the various jurisdictions of this country. Prosser, *Torts*, "Economic Relations," § 129 (4th ed., 1971), and Harper and Jones, *The Law of Torts*, "Business Torts," sects. 6.7-6.12, vol. 1 (1956). It appears that this legal principle, which has become firmly imbedded in the law of a majority of American jurisdictions, was derived from the 1853 English decision in *Lumley v. Gye*, 2 El. & Bl. 216, 118 Eng. Rep. 749 (Q.B. 1853), and the 1893 decision of *Temperton v. Russell*, L.R. [1893] 1 Q.B. 715 (C.A.). However, the necessary elements and requirements to maintain such a cause of action vary somewhat from jurisdiction to jurisdiction and from case to case depending upon the peculiar factual situations which can be so varied in the business or commercial world. Virginia does not appear to have developed a well-defined body of law for tortious interference with contractual or business relations, the most analogous cases being conspiracy to induce breach of contract or misrepresentations or fraud or deceit or libel or slander which results in breaches of contract or tend to injure others in their trade or business. *See, Worrie v. Boze*, 198 Va. 533 (1956), and *Rosenberg v. Craft*, 182 Va. 512 (1944). Virginia has adopted a criminal statute which provides for treble civil damages against anyone who conspires to injure another in his trade, business or profession. § 18.2-499 of the Code. The court determined that this statutory cause of action had no application to the case at bar because, *inter alia*, there was no indication of concert of action or actual malice. Nevertheless, the court concluded that Virginia does and would follow the lead of the majority of jurisdictions in recognizing a common law right of action for the intentional interference with a contractual or business relationship.

In ascertaining the law which Virginia would follow in the field of tortious interference with contracts, the court, with the able assistance of counsel, devoted two days during the trial of the case to reviewing cases from other jurisdictions and the treatises of various commentators as well as the Restatement of Torts in formulating the jury instructions which became the law of this case. Neither party assigns as error the court's interpretation of the applicable law to this case; regardless of whether Virginia would follow the lead of this trial court as to the governing legal principles, such has become

the law which will govern this case. A brief but general recitation of the applicable law and its purpose and the interests which it is designed to protect will aid further discussion. Very simply stated in the Restatement of Torts at § 766, "one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby."

The numerous cases cited by counsel demonstrate the difficulty in applying the legal principles to complex factual situations. While some jurisdictions recognize negligent interference with contracts as actionable, it must be borne in mind that the case at bar involves an intentional tort. *See, Negligent Interference With Contracts*, 63 Va. L. Rev. 13 (1977). Knowledge of the existence of a contract is a prerequisite in order to constitute this actionable intentional tort, however, it is not necessary that the contract or business relationship be consummated or in existence or even enforceable so long as its terms can be reasonably ascertained. *Lewis v. Bledsoe*, 202 F. 7, 16-17 (4th Cir. 1912). The contract may be anticipatory or even unenforceable under the Statute of Frauds; however, the interfering party must know of its existence to constitute tortious interference. An illegal contract will not, according to the commentators, support a cause of action for tortious interference. That is not to say that the interfering party must specifically intend by his acts or conduct to interfere with the contract or business relation, although specific intent or actual malice may well support a cause of action even in the face of a claim of privilege or justification; it is sufficient if the interfering party did an intentional act with knowledge of the existence of an anticipated contract or business relationship reasonably knowing that the acts might induce a breach or noncompliance.

> Given the intention to interfere with the contract, liability usually will turn upon the ultimate purpose or object which the defendant is seeking to advance. The early cases, with their emphasis upon "malice," regarded proof of an improper motive as an essential part

of the plaintiff's cause of action. As the tort became more firmly established, there was a gradual shift of emphasis, until today it is generally agreed that an intentional interference with the existing contractual relations of another is prima facie sufficient for liability . . . . Prosser, *Torts*, § 129, p. 942 (4th ed., 1971).

The laudable purposes for this principle of law are self-evident and founded upon the interest of society in protecting persons in their contractual or business relationship from interference by third persons without sufficient justification.

A common defense to the tort of intentional interference with a contract or business relationship, as was asserted in the case at bar, is that the interfering party was acting under a qualified or absolute privilege or had sufficient interest in the contract or business relationship that such interference was legally justified. The burden of proof to establish privilege or justification is upon the one so asserting and is usually a jury question. Prosser *Torts*, "Economic Relations," § 129, p. 942 (4th ed., 1971). Section 773 of the Restatement of Torts states:

One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction.

Sections 767 and 768 of the Restatement of Torts enumerate important factors which should be considered in determining whether there was a privilege or justification for the interference, e.g., the nature of the contract interfered with, the nature of the expectancy interfered with, the relationship between the various parties, whether the interference advanced the interests of the actor or third parties, the social interests in protecting the

interests of the parties, whether improper means were employed which resulted in the interference, etc.

> The question of privilege is, of course, as broad as the catalogue of the possible interests involved, and it must be considered in the light of the means adopted and the relations between the parties. Obviously, in a field so vast, only very general mention may be made of the types of cases which have arisen. Prosser, *Torts, supra* at p. 943.

Damages which are recoverable for tortious interference with a contract or business relation are those which would result from the breach of any other contract and which directly flow from the breach of contract or interference with the business relationship. Remote or speculative profits or damages are not recoverable. The burden rests with the plaintiffs to prove their damages by a preponderance of the evidence, however, the law does not require exact mathematical precision.

### *Application of Legal Principles To Facts at Bar*

A. *Intentional Interference*

Applying the foregoing legal principles to the previously summarized facts, the initial issue for consideration by the court is whether the jury could conclude, as it so found in its special verdicts, that the Bank intentionally and with legal malice interfered with a contract or business relation between Glen Watson, Wallace Russell, and Hershell Pennington? If there is evidence to support that conclusion, it would be improper for the court to disturb the special verdict on that point. There was no serious dispute in the evidence that a contract existed or was near fruition between the plaintiffs to enter a joint venture for mining coal at Mill Creek, Kentucky. Certainly the jury could so conclude. The terms of the agreement were sufficiently definite or reasonably ascertainable to support an action for tortious interference. The plaintiffs had actually undertaken to execute their

agreement. While the defendant asserts that the contract required the debtors to breach the security agreement by removing the chattel from its designated location, such is pertinent only to whether the acts or conduct by the Bank were justified under the circumstances, but do not abrogate the existence of a contract which may be wrongfully interfered with by a third party. As previously noted, an unenforceable contract as between the parties cannot with impunity be impaired by a third party unless there exists sufficient justification or legal privilege to so act. Such contract can still be the basis to support a claim of tortious interference. Thus, the court is of the opinion that there existed between the plaintiffs a sufficient contract or business agreement to support their cause of action.

Did the Bank intentionally and with legal malice interfere with the contractual or business relation? While this was a major factual controversy in the case, the jury could properly conclude that officials of the Bank induced the plaintiffs not to perform their partially executed contract and coal mining venture by threatening foreclosure unless the plaintiffs reorganized their business on terms and with other persons acceptable to the Bank. It is certainly arguable that the Bank officials specifically intended that the agreement between the plaintiffs not be performed at the risk of foreclosure, but suffice it to say, that the trier-of-fact could properly conclude that the Bank officials intentionally induced a course of action which could reasonably be expected to result in a repudiation of the contract between the plaintiffs. Therefore, the court is of the opinion that the finding of the jury that the officials of the Bank intentionally interfered with the contract or business relation was warranted under the facts.

Under the law of this case in order for the plaintiffs to prevail, the evidence must show at least legal malice, as distinguished from actual malice, to exist. Legal malice can be inferred from the doing of an intentional act with reasonable knowledge that it will result in harm to another. *Coulson v. General Motors Corp.*, 488 F.2d 202, 205 (5th Cir. 1974). However, legal malice and justification cannot co-exist since if an act or conduct is justified, the law will not permit malice to be inferred. Thus, unless

the conduct is privileged or justified, the jury may properly infer malice from the doing of an intentional act with knowledge of its harmful consequences. The defendant having the burden of proof as to justification or privilege may properly be considered by the jury to have acted with legal malice unless as a matter of law, such conduct was justified or privileged, which will be reserved for later discussion.

The jury's special verdicts also made a finding that the officials of the Bank acted without actual malice. That finding deserves comment at this point and also as it will relate to the later discussion of justification or privilege because it may involve matters not readily discernible from the record. Originally, the plaintiffs' motion for judgment alleged improper conduct of one Henry Turner, a member of the Bank board of directors, in inducing the tortious interference. While Turner was deleted before trial as a party, various suggestions and efforts were made by the plaintiffs in an attempt to prove that he or other Bank officials or the Sergents would or could derive a personal financial benefit by forcing the control and management of the coal operation into the hands of others than the plaintiffs. The underlying contention is that those in control of the coal operation would be in a position to market the coal at a depressed price to companies in which Turner or other Bank officials or the Sergents had an interest thereby allowing themselves or others to derive a personal financial benefit from the failure of the company by being able to resell the coal with a greater margin of profit. Likewise equipment or personnel could be used for personal advantage. While the court is in accord with the finding of the jury, the situation remains as a potential relationship that existed between the parties and others that the court must later consider as a factor affecting whether the interference was justified or privileged.

## B. *Justification or Privilege*

To briefly recapitulate the guiding principles which will govern the court's consideration of whether the conduct of the officials of the Bank were justified or privileged, the following must apply:

1. The burden rests with the individual asserting that his conduct was justified or privileged to establish such by a preponderance of the evidence, *Smith v. American Guild, etc.*, 349 F.2d 975 (8th Cir. 1965), and

2. Justification or privilege normally depend upon factual disputes which are to be resolved by the jury, *Bennett v. Storz*, 134 N.W.2d 892, 900-901 (Minn. 1965), and

3. In considering whether the interference is justified or privileged, a balancing of the interests and rights of the parties and the interests of society are necessarily involved, and

4. The court will not substitute its judgment for that of the jury unless plainly wrong and without evidence to support it.

In order for the defendant to prevail on its motion to set aside the verdict based on the defense that its conduct was justified or privileged, it must appear after considering and balancing all factors that, as a matter of law, such interference was proper. "It is only when the actor participated in the exercise of an absolute right, equal or superior to the right invaded, that interference can be justified *as a matter of law*, and the issue withheld from the jury." *Mitchell v. Aldrich*, 122 Vt. 19, 163 A.2d 833, 837 (1960). For cases finding justification as a matter of law, see *McReynolds v. Short*, 115 Ariz. 166, 564 P.2d 389, and *Raycroft v. Tayntor*, 68 Vt. 219, 35 A. 53, 33 L.R.A. 225. The plaintiffs have submitted numerous cases from many jurisdictions, all of which appear in the record, in support of their contention that the jury verdict should stand. Each case takes the balancing approach emphasizing those factors most pertinent to the peculiar factual situation involved.

> The law has crystallized relatively few concrete rules to determine the existence or want of privilege. All the circumstances must be analyzed and considered with reference to the type of relation disrupted, the means employed and the purpose of the actor's interference.

*Mitchell v. Aldridge, supra* at p. 837. In balancing the interests and rights of the parties in the instant case,

the plaintiffs would emphasize that not only do they, but society has an interest in individuals being able to freely enter into legal business relations without intentional interference from a third party. They argue that this interest is equal or superior to any security interest of the Bank which might justify interference. Further, the plaintiffs assert that not only was their contract legal but was being pursued to enhance the Bank's prospect of payment. The plaintiffs would emphasize that while the relationship of the Bank and Watson and Russell was that of debtor and creditor, as opposed to officious intermeddling by a third party with no financial stake, nevertheless, the plaintiffs had a substantial independent economic investment in the venture which was known to the Bank officials. Further, the plaintiffs strongly urge the court to consider that the Uniform Commercial Code provides for the remedies available for a secured party against a defaulting debtor, but rather than pursue such remedies, the Bank has overreached its legal remedies by tortiously interfering with the plaintiffs' superior rights to freely contract. The Bank had the right to foreclose, but, if electing not to do so, there exists no legal justification to interfere with the plaintiffs' right to do business.

> In the area of rights after default, our legal system has traditionally looked with suspicion on agreements designed to cut down the debtor's rights and free the secured party of his duties . . . The default situation offers great scope for overreaching; the suspicious attitude of the courts has been grounded in common sense.

*Official Comment* § 8.9-501, Code of Virginia, as amended, p. 483.

The plaintiffs would assert that for the Bank to use its economic leverage to coerce the plaintiffs into an unacceptable business arrangement, in which not only their voice in management was relinquished but their proportionate degree of ownership diluted, constituted bad faith by the Bank. Additionally, the plaintiffs contend that officers or directors of the Bank were in a position to potentially derive a personal financial benefit from

the business venture which was forced upon the plaintiffs, a situation which the interest of society should not condone.

The Bank on the other hand would emphasize that it did no more than exercise an absolute legal right to threaten foreclosure against debtors seriously in default unless an acceptable alternative was presented which would curtail, in whole or in part, the delinquency and justify forbearance. The Bank would point out that the debtors at all times had the discretion to present any alternative agreement which they might arrange and that Watson's own evidence indicated that he initiated negotiations with the Sergents through Birg Sergent. The defendant strongly urges the court to consider that, as between the parties, the Bank had the greatest financial interest at stake and, if its security was further impaired, its risk of loss was greater than that of the plaintiffs. The Bank would further emphasize that it could not be motivated by bad faith or ill will, but to the contrary, had an equal if not superior interest in the success of the plaintiffs' venture. There was no showing that any interference sought to advance the interest of the Bank or any third party to the detriment of the plaintiffs, but, in fact, the Bank officials were seeking to assist the plaintiffs in the success of their venture for the mutual benefit of all concerned. The Bank points out that the ultimate failure of the venture did result in a loss to all concerned, including the Bank, and could in no way advance their interest or any third person. Further, the Bank observes that not only were the plaintiffs in default by nonpayment, but their secured position had become further impaired not only by moving the miner to another location but by permitting it to be subjected to the claim of a third party, Hershell Pennington, and that with the security in jeopardy, the Bank by exploring other avenues to allow the business enterprise to continue with persons that would act more responsibly than had the plaintiffs, the Bank was seeking to avoid the overreaching of the plaintiffs and possibly the salvage of the Bank's investment.

The foregoing factors are those which the court must consider in determining whether, as a matter of law, the Bank was legally justified or privileged in preventing the contract between Watson and Russell and Pennington

from being consummated. Otherwise, the finding of the jury in the special verdict that there was no justification must stand. The plaintiffs place great reliance upon *Mitchell v. Aldridge, supra,* as well as numerous other cases in the record to support their position that justification or privilege is for resolution by the jury. The *Mitchell* case warrants discussion. In that 1960 case from Vermont, the plaintiff had offered to purchase a herd of 102 dairy cows from one Comette, the cows being subject to a chattel mortgage to secure a loan with a trust company. The trust company, having a security interest, had approved the sale and Comette had accepted the offer with part payment having been made. However, the mortgagee bank had arranged that before final approval, a Mr. Aldrich was to appraise the cattle. Aldrich, along with a third party, upon going to make the appraisal, represented to Comette that the bank would not in their opinion approve the sale to the plaintiff Mitchell and further represented that Mitchell may not pay the balance of the purchase price to Comette. Drew and Aldrich then offered Comette a sum greater than that offered by Mitchell, which was accepted. Aldrich and Drew subsequently derived a net profit from the resale of the cattle. The sale without bank approval would have violated both the terms of the security agreement and would have violated the criminal law of Vermont. Upon trial the court found that Aldrich had tortiously interfered with Mitchell's enforceable contract for the purchase of the cattle. The plaintiffs contend that the *Mitchell* situation is analogous to the instant case because it dealt with tortiously interfering with a contract to dispose of mortgaged property, and the court held that there was no justification to interfere with a contract of sale merely because the property was subject to a security interest. However, the court pointed out that Aldrich could not take refuge in any claim of privilege or justification because he was not clothed with any authority nor did he derive any power from the mortgagee to approve the sale. The court stated:

> The defendants seek refuge in the authority conferred on the Chittenden Trust Company, by statute and contract, to disapprove the plaintiff's trade as justification for their

interdiction of Comette's engagement. The authority which Aldrich derived from the bank was restricted to appraising the Comette herd. There is nothing to indicate the privilege to veto the proposed sale of the mortgaged property was delegated to Aldrich. Herein lies the principal distinction between the facts of this appeal and those that controlled in *Raycroft v. Tayntor, supra,* 68 Vt. at page 223, 35 A. at page 54. In the *Raycroft* case, the privilege of interference was exercised by a defendant who was clothed with all the right and power of one legally justified to intrude.

*Mitchell v. Aldrich, supra,* at p. 837.

The conclusion of the court was founded upon the finding that Aldrich was an officious intruder with no color or claim of privilege or justification. However, the Mitchell court went on to state in dictum the legal rights of mortgagees to interfere with the use of secured property, in which the plaintiffs place great reliance.

[O]wnership of the mortgagee in the encumbered property is subject to the mortgagor's equity and right to redeem . . . . The mortgagee's right to defeat the proposed agreement to sell was limited by the nature of security required to protect the mortgage loan. In those instances where it might conclude by fair and honest judgment that the proposed sale would dissipate or jeopardize the security of the loan, a clear right to forbid the sale would exist. But where the integrity of the seller's obligation would not be affected, the mortgagee has no absolute right to prohibit the sale or disrupt the bargain . . . . It was for the jury to say whether . . . the defendants established that the occasion of their interference was authorized by the bank and *justified by a present danger to the bank's mortgage security* (p. 838, emphasis added).

The case of *Meason v. Ralston Purina Co., et al.,* 107 P.2d 224 (Ariz. 1940), deals with the rights of a secured party to interfere with the proposed sale of the secured property which was discussed by dictum in the *Mitchell* case. The findings in *Meason* are very pertinent to the case at bar and warrant analysis. Ralston Purina had a security interest in turkeys owned by Meason which had been pledged as collateral to secure credit in order to purchase feed for his turkey farm. The contract envisioned that the turkeys would be sold and a portion of the sales price would be paid to curtail the obligation. Meason arranged for a sale of the turkeys, which was frustrated by Ralston Purina. Ralston Purina claimed that they were acting under an absolute right under the agreement which was as a matter of law equivalent to justification. However, the court said that since the original security agreement envisioned a sale of the turkeys the right to interfere was only a qualified right, not an absolute right, because there was nothing "which its honest judgment led it to believe that the result would dissipate or jeopardize its security." (p. 228.) In holding that on these facts the claim of privilege or justification was qualified rather than absolute and for the jury to decide, the *Meason* court said:

> If, for instance, the sale was to an irresponsible party, or for a price much below the market and its security, after the indebtedness should be reduced by the receipts applicable thereto under the contract, would be insufficient, the mortgagee's right to interfere would be clear . . . but this did not justify his interference with a contract of sale that had already been entered into and partially carried out, unless he honestly believed that the plaintiff's security would be weakened or become insufficient for any balance that might remain. Under these circumstances, therefore, it was clearly a jury question whether Vaught's interference with the sale was justified. (p. 228.)

## Conclusion

A review of all the authority before the court leads to the conclusion that in secured transactions which envision that the secured property will be utilized in a business transaction, rarely will there be a situation in which the secured party will be permitted to interfere in the transaction without it being for the trier of fact to determine whether the interference is justified. Even though the security agreements and applicable statutes place conditions upon the use of collateral, as in the *Meason* case, most envision that there will be some use of the collateral. In most instances, the right to interfere is qualified, rather than absolute, and a balancing of the numerous factors previously discussed must be resolved by a jury. In order for the claim of justification or privilege to interfere to be absolute, it must clearly appear that the secured party "honestly believed that the plaintiffs' security would be weakened or become insufficient for any balance that might remain . . . . If, for instance, the sale was to an irresponsible party, or for a price much below the market and its security, after the indebtedness should be reduced by the receipts applicable thereto under the contract, would be insufficient, the mortgagee's right to interfere would be clear." *Meason v. Ralston Purina Co., supra*, p. 228. Unless the right of Lee Bank & Trust Company to interfere with the contract or business venture between Watson and Russell and Pennington was absolute, rather than qualified, the special verdicts of the jury must stand, unless infirm for other reasons.

The court has previously recited the competing interests of the parties, which have been advanced by counsel in support of the respective contentions as to whether the defense of justification under the circumstances of this case is a qualified right and for jury resolution or whether an absolute right.

There exist numerous facts and circumstances in this situation which compel the court to conclude that the right of Lee Bank & Trust to interfere was clearly and absolutely justified in the case at bar. First, the loan obligation was seriously in default and had been since its inception with little or no prospect of payment. Only

one payment had been made with at least four payments being in arrears. The coal mine had ceased operation in August. While this factor alone may not justify interference, since a secured party after default may be guilty of overreaching, it is certainly a significant factor to consider in determining whether there exists an absolute right to interfere with a prospective contract involving the secured property. Serious default with little prospect of payment gives rise to a sufficient economic interest for the Bank to intervene in any arrangement which would dilute or jeopardize its financial interest. Second, the Bank had at least an equal, if not superior, financial interest in the secured collateral to that of Watson and Russell. Third, the Bank had made an effort to protect its security interest by peaceably repossessing the property which had been frustrated by Watson and Russell or those claiming under them. Fourth, the collateral of the Bank had been subjected to the claims of third parties, specifically Hershell Pennington, who had acted in an irresponsible manner insofar as the security interest of the Bank was concerned. Fifth, at various times the collateral had been permitted to deteriorate and be in a state of disrepair. Sixth, the collateral had been moved from its designated location in the security agreement, albeit with knowledge of Bank officials, without the consent of the Board of Directors. Seventh, the original security agreements of the Bank included not only the Wilcox miner but inventory and receivables and consumer goods and real estate at the Child's Creek location. To permit the Watson, Russell and Pennington operation would jeopardize that additional security. Eighth, the interest of society in protecting the parties to such a transaction should be of paramount concern.

Society has an equal interest in protecting both parties to a secured transaction. It has an interest in protecting the debtor in default from overreaching by the secured party as well as permitting the debtor use of his property so long as the rights of the secured party are not jeopardized. Society has a co-equal interest in seeing that the rights of a secured party are adequately preserved. While a secured party has certain statutory and contractual rights, such are not exclusive. As between the debtor and secured party, a secured party may forbear

and not enforce its statutory rights after default so long as it does not overreach or intentionally and maliciously seek to injure the debtor. Forbearance may be conditioned upon such terms acceptable to the secured party so long as such does not constitute overreaching or an intentional effort to harm the debtor. To hold otherwise would impose unconscionable restriction upon secured transactions. Lending institutions would be in a position of having no latitude to negotiate with defaulting debtors to seek an acceptable alternative to foreclosure. Debtors who encountered temporary financial setbacks causing default would risk financial ruin by foreclosure by being unable to negotiate with lending institutions. Not only is it commonplace in the marketplace for large lending institutions to place conditions upon defaulting debtors to avoid foreclosure, it is a laudable practice in the best interest of society so long as free from overreaching or the intent to harm the debtor.

There is no evidence from which a reasonable person could conclude that the Bank sought to or did gain any financial benefit by preventing Watson and Russell and Pennington to contract. In fact, the evidence indicates that the Bank was seeking to protect the interest of itself to the mutual benefit of the debtors. The Bank ran as much risk of financial loss as did the debtors in whatever course was followed. While others connected with the Bank were in the position of doing business with the reorganized business venture, there is no evidence to indicate this was intended or occurred. It is mere speculation that Watson, Russell and Pennington would not have encountered the same fate as did Princess Anne Coal Company. "In those instances where it might conclude by fair and honest judgment that the proposed [business venture] would dissipate or jeopardize the security of the loan, a clear right to forbid the [venture] would exist." *Mitchell v. Aldrich, supra*, p. 838.

Accordingly, it is the decision of the court that the right of the Bank to interfere with the contract was absolutely justified under these circumstances, that the defense of justification should not have been · submitted to the jury and that the verdicts for the plaintiffs must be set aside and judgment rendered for the defendant Lee Bank & Trust Company.

## Damages

Notwithstanding the ruling of this court setting aside the jury verdict on the issue of liability, since the decision may and should be reviewed on appeal, it appears appropriate to further consider whether the jury's award of damages to the plaintiffs is proper under the evidence. The facts presented to the jury in support of damages consisted of evidence showing what the anticipated gross proceeds would have been from the mining venture had Watson, Russell and Pennington been allowed to proceed as well as the anticipated expenses and overhead and net proceeds. The court has heretofore recited the specific evidence introduced, particularly that of Ott Taylor, projecting what the profit and loss picture would have been of the anticipated coal mining venture. Based on these projections, the plaintiffs then projected the amount of profit or income which each would have lost as a result of interference by the Bank with their undertaking.

Thereafter, each plaintiff testified that each suffered further personal losses of two types because of the failure of their venture. Each testified as to a financial loss of that which they already had invested in the undertaking, and each testified as to further personal losses and expenses occasioned by not being able to meet their obligations, changing jobs and destroying their credit reputations. Each of these additional personal claims were alleged to be a natural consequence of their initial contention that had the venture not been frustrated by the Bank, the business would have been profitable to the plaintiffs. To recover for the latter claims, the plaintiffs must necessarily have been able to recover damages for the business loss which had been interfered with.

I am of the opinion that whether the damages for the business loss were recoverable under the evidence introduced is controlled by the principles enunciated in a long line and well-established line of Virginia cases, viz., *Kay Adv. Co. v. Olde London Transportation*, 216 Va. 273, 275 (1975), *Mullen v. Brantley*, 213 Va. 765, 768 (1973), and *Sinclair Refining v. Hamilton & Dotson*, 164 Va. 203, 211 (1935). "Prospective profits are not recoverable in any case if it is uncertain that there

would have been any profits, or if the alleged profits are so contingent, conjectural, or speculative that the amount thereof cannot be proved with a reasonable degree of certainty." (Citations omitted).

> [W]here the business which is interfered with or prevented as a result of a breach of contract is a *new or unestablished nonindustrial business*, or one merely in contemplation, the anticipated profits from such business cannot be recovered, for the reason that it cannot be rendered certain that there would have been any profits at all from the conduct of such business. (Emphasis added.)

*Kay Adv. Co. v. Olde London Transp., supra*, p. 275.

This business never came into existence and had no record upon which profits or losses could be projected. The coal industry, by its very nature, is highly speculative. Even Ott Taylor acknowledged the undertaking to be "a gamble." There is little or nothing in the record to suggest that the undertaking would not have suffered the same fate as did Princess Anne Coal Company. Accordingly, since all the damages were predicated upon prospective profits which could not in the first instance support the jury's award of damage, the court is of the further opinion that the verdicts cannot stand and must be set aside.

### Counterclaim

Lee Bank & Trust Company further seeks to set aside the jury verdict for Watson and Russell on the counterclaim for the deficiency due on the promissory note secured by the continuous miner and award it judgment against Watson and Russell for the balance. Evidence was introduced as to how the resale of the miner was conducted in order for the jury to determine whether such was in a commercially reasonable manner. The evidence further indicated that neither Watson nor Russell received notice of either the Kentucky judicial sale or the private sale after repossession by Lee Bank & Trust. The jury was properly instructed on these issues and could properly conclude that resale

by the Bank was not in a commercially reasonable manner nor upon reasonable notification as required by § 8.9-504(3) of the Code. Failure of the secured party to comply with these requirements subjects the secured party to liability as provided in § 8.9-507 of the Code and would justify the jury in concluding that the rights of the debtors had been prejudiced to the extent of any deficiency claimed to be due. Accordingly, I am of the opinion that the issue before the jury on the counterclaim was properly before them and the verdict must stand.