710 P.2d 1025

Catherine Sue **WAGENSELLER**,
Plaintiff-Appellant,

v.

**SCOTTSDALE MEMORIAL HOSPITAL;** Donald A. Andrews and Jane Doe Andrews, his wife; Neal Brown and Jane Doe Brown, his wife; John W. Holmes and Jane Doe Holmes, his wife; and Kay Smith, a single person, Defendants-Appellees.

No. 17646–PR.

Supreme Court of Arizona,
En Banc.

June 17, 1985.

Reconsideration Denied Aug. 20, 1985.

Supplemental Opinion Nov. 27, 1985.

Hocker & Axford by Naida B. Axford, R. Kelly Hocker, Phoenix, for appellant.

Thomas V. Rawles, Mesa, and Fennemore, Craig, Von Ammon, Udall & Powers by John D. Everroad, R.C. Mitten, Timothy Berg, Phoenix, for appellees.

FELDMAN, Justice.

Catherine Sue Wagenseller petitioned this court to review a decision of the court of appeals affirming in part the trial court's judgment in favor of Scottsdale Memorial Hospital and certain Hospital employees (defendants). The trial court had dismissed all causes of action on defendants' motion for summary judgment. The court of appeals affirmed in part and remanded, ruling that the only cause of action available to plaintiff was the claim against her supervisor, Kay Smith. *Wagenseller v. Scottsdale Memorial Hospital*, 714 P.2d 412 (1984). We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and Rule 23(c), Ariz.R.Civ.App.P., 17A A.R.S. We granted review to consider the law of this state with regard to the employment-at-will doctrine. The issues we address are:

1. Is an employer's right to terminate an at-will employee limited by any rules which, if breached, give rise to a cause of action for wrongful termination?

2. If "public policy" or some other doctrine does form the basis for such an action, how is it determined?

3. Did the trial court err, in view of *Leikvold v. Valley View Community Hospital*, 141 Ariz. 544, 688 P.2d 170 (1984), when it determined as a matter of law that the terms of Scottsdale Memorial Hospital's personnel policy manual were not part of the employment contract?

4. Do employment contracts contain an implied covenant of "good faith and fair dealing," and, if so, what is the nature of the covenant? [1]

---

1. The first, second, and fourth issues presented were those left open in *Leikvold*. See 141 Ariz. at 545–46 n. 1, 688 P.2d at 171–72, n. 1.

5. What is the scope of a supervisor's privilege to interfere in the beneficial employment relationship between a supervised employee and the common employer?

## FACTUAL BACKGROUND

Catherine Wagenseller began her employment at Scottsdale Memorial Hospital as a staff nurse in March 1975, having been personally recruited by the manager of the emergency department, Kay Smith. Wagenseller was an "at-will" employee—one hired without specific contractual term. Smith was her supervisor. In August 1978, Wagenseller was assigned to the position of ambulance charge nurse, and approximately one year later was promoted to the position of paramedic coordinator, a newly approved management position in the emergency department. Three months later, on November 1, 1979, Wagenseller was terminated.

Most of the events surrounding Wagenseller's work at the Hospital and her subsequent termination are not disputed, although the parties differ in their interpretation of the inferences to be drawn from and the significance of these events. For more than four years, Smith and Wagenseller maintained a friendly, professional, working relationship. In May 1979, they joined a group consisting largely of personnel from other hospitals for an eight-day camping and rafting trip down the Colorado River. According to Wagenseller, "an uncomfortable feeling" developed between her and Smith as the trip progressed—a feeling that Wagenseller ascribed to "the behavior that Kay Smith was displaying." Wagenseller states that this included public urination, defecation and bathing, heavy drinking, and "grouping up" with other rafters. Wagenseller did not participate in any of these activities. She also refused to join in the group's staging of a parody of the song "Moon River," which allegedly concluded with members of the group "mooning" the audience. Smith and others allegedly performed the "Moon River" skit twice at the Hospital following the group's

return from the river, but Wagenseller declined to participate there as well.

Wagenseller contends that her refusal to engage in these activities caused her relationship with Smith to deteriorate and was the proximate cause of her termination. She claims that following the river trip Smith began harassing her, using abusive language and embarrassing her in the company of other staff. Other emergency department staff reported a similar marked change in Smith's behavior toward Wagenseller after the trip, although Smith denied it.

Up to the time of the river trip, Wagenseller had received consistently favorable job performance evaluations. Two months before the trip, Smith completed an annual evaluation report in which she rated Wagenseller's performance as "exceed[ing] results expected," the second highest of five possible ratings. In August and October 1979, Wagenseller met first with Smith and then with Smith's successor,[2] Jeannie Steindorff, to discuss some problems regarding her duties as paramedic coordinator and her attitude toward the job. On November 1, 1979, following an exit interview at which Wagenseller was asked to resign and refused, she was terminated.

She appealed her dismissal in letters to her supervisor and to the Hospital administrative and personnel department, answering the Hospital's stated reasons for her termination, claiming violations of the disciplinary procedure contained in the Hospital's personnel policy manual, and requesting reinstatement and other remedies. When this appeal was denied, Wagenseller brought suit against the Hospital, its personnel administrators, and her supervisor, Kay Smith.

Wagenseller, an "at-will" employee, contends that she was fired for reasons which contravene public policy and without legitimate cause related to job performance. She claims that her termination was wrongful, and that damages are recoverable under both tort and contract theories. The

2. Smith left the emergency department on October 1, 1979.

Hospital argues that an "at-will" employee may be fired for cause, without cause, or for "bad" cause. We hold that in the absence of contractual provision such an employee may be fired for good cause or for no cause, but not for "bad" cause.

## THE EMPLOYMENT-AT-WILL DOCTRINE

### History

As early as 1562, the English common law presumed that an employment contract containing an annual salary provision or computation was for a one-year term. Murg & Scharman, *Employment at Will: Do the Exceptions Overwhelm the Rule?* 23 B.C.L.Rev. 329, 332 (1982). Originally designed for the protection of seasonal farm workers, the English rule expanded over the years to protect factory workers as well. Workers were well protected under this rule, for the one-year presumption was not easy to overcome. *Id.* English courts held an employer liable for breaching the employment contract if he terminated an employee at any time during the year without "reasonable cause to do so." 1 *W. Blackstone, Commentaries* *413. To uphold an employer's discharge of an employee without a showing of "good cause," the courts required a clear expression of a contrary intent as evidenced either on the face of the contract or by a clearly defined custom of the industry. Murg & Scharman, *supra*, at 332.

In the early nineteenth century, American courts borrowed the English rule. The legal rationale embodied in the rule was consistent with the nature of the predominant master-servant employment relationship at the time because it reflected the master's duty to make provision for the general well-being of his servants. *Id.* at 334 and n. 22. In addition, the master was under a duty to employ the servant for a term, either a specified or implied time of service, and could not terminate him strictly at will. Hermann & Sor, *Property Rights in One's Job: The Case for Limiting Employment-at-Will*, 24 Ariz.L.Rev. 763, 770 (1982). The late nineteenth century, however, brought the Industrial Revolution; with it came the decline of the master-servant relationship and the rise of the more impersonal employer-employee relationship. In apparent response to the economic changes sweeping the country, American courts abandoned the English rule and adopted the employment-at-will doctrine. Murg & Scharman, *supra*, at 334. This new doctrine gave the employer freedom to terminate an at-will employee for any reason, good or bad.

The at-will rule has been traced to an 1877 treatise by H.G. Wood, in which he wrote:

> With us the rule is inflexible, that a general or indefinite hiring is *prima facie* a hiring at will, and if the servant seeks to make it out a yearly hiring, the burden is upon him to establish it by proof.... [I]t is an indefinite hiring and is determinable at the will of either party....

*H.G. Wood, Law of Master and Servant* § 134 at 273 (1877). As commentators and courts later would point out, none of the four cases cited by Wood actually supported the rule. *See Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 602 & nn. 13–14, 292 N.W.2d 880, 886–87 & nn. 13–14 (1980); Note, *Implied Contract Rights to Job Security*, 26 Stan.L.Rev. 335, 341–42 n. 54 (1974). Wood's rule also ran directly counter to another American treatise that stated the one-year presumption as the rule that some courts continued to follow. Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith*, 93 Harv.L.Rev. 1816, 1825 n. 51 (1980) (citing *C. Smith, Law of Master and Servant* 53–57 (1852)).

However unsound its foundation, Wood's at-will doctrine was adopted by the New York courts in *Martin v. New York Life Insurance Co.*, 148 N.Y. 117, 42 N.E. 416 (1895), and soon became the generally accepted American rule. In 1932, this court first adopted the rule for Arizona: "The general rule in regard to contracts for personal services, ... where no time limit is

provided, is that they are terminable at pleasure by either party, or at most upon reasonable notice." *Dover Copper Mining Co. v. Doenges*, 40 Ariz. 349, 357, 12 P.2d 288, 291–92 (1932). Thus, an employer was free to fire an employee hired for an indefinite term "for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of legal wrong." Blades, *Employment at Will v. Individual Freedom: On Limiting the Abusive Exercise of Employer Power*, 67 Colum.L.Rev. 1404, 1405 (1967) (quoting *Payne v. Western & Allegheny Railroad Co.*, 81 Tenn. (13 Lea) 507, 519–20 (1884), *overruled on other grounds, Hutton v. Watters*, 132 Tenn. 527, 179 S.W. 134 (1915)).

### Present-Day Status of the At-Will Rule

In recent years there has been apparent dissatisfaction with the absolutist formulation of the common law at-will rule. The Illinois Supreme Court is representative of courts that have acknowledged a need for a less mechanical application of the rule:

> With the rise of large corporations conducting specialized operations and employing relatively immobile workers who often have no other place to market their skills, recognition that the employer and employee do not stand on equal footing is realistic. In addition, unchecked employer power, like unchecked employee power, has been seen to present a distinct threat to the public policy carefully considered and adopted by society as a whole. As a result, it is now recognized that a proper balance must be maintained among the employer's interest in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out.

*Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 129, 52 Ill.Dec. 13, 15, 421 N.E.2d 876, 878 (1981) (citation omitted). Today, courts in three-fifths of the states have recognized some form of a cause of action for wrongful discharge. Lopatka, *The Emerging Law of Wrongful Discharge—A Quadrennial Assessment of the Labor Law Issue of the 80s*, 40 Bus. Law. 1 (1984).

The trend has been to modify the at-will rule by creating exceptions to its operation. Three general exceptions have developed. The most widely accepted approach is the "public policy" exception, which permits recovery upon a finding that the employer's conduct undermined some important public policy. The second exception, based on contract, requires proof of an implied-in-fact promise of employment for a specific duration, as found in the circumstances surrounding the employment relationship, including assurances of job security in company personnel manuals or memoranda. Under the third approach, courts have found in the employment contract an implied-in-law covenant of "good faith and fair dealing" and have held employers liable in both contract and tort for breach of that covenant. Wagenseller raises all three doctrines.

### THE PUBLIC POLICY EXCEPTION

The public policy exception to the at-will doctrine began with a narrow rule permitting employees to sue their employers when a statute expressly prohibited their discharge. *See Kouff v. Bethlehem-Alameda Shipyard*, 90 Cal.App.2d 322, 202 P.2d 1059 (1949) (statute prohibiting discharge for serving as an election officer). This formulation was then expanded to include any discharge in violation of a statutory expression of public policy. *See Petermann v. Teamsters Local 396*, 174 Cal. App.2d 184, 344 P.2d 25 (1959) (discharge for refusal to commit perjury). Courts later allowed a cause of action for violation of public policy, even in the absence of a specific statutory prohibition. *See Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975) (discharge for being absent from work to serve on jury duty). The New Hampshire Supreme Court announced perhaps the most expansive rule when it held an employer liable for discharging an employee who refused to go out with her foreman. The court concluded that termination "motivated by bad faith or malice or based on

retaliation is not [in] the best interest of the economic system or the public good and constitutes a breach of the employment contract." *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 133, 316 A.2d 549, 551 (1974).[3] Although no other court has gone this far, a majority of the states have now either recognized a cause of action based on the public policy exception or have indicated their willingness to consider it, given appropriate facts.[1] The key to an employee's claim in all of these cases is the proper definition of a public policy that has been violated by the employer's actions.

Before deciding whether to adopt the public policy exception, we first consider what kind of discharge would violate the rule. The majority of courts require, as a threshold showing, a "clear mandate" of public policy. *E.g., Parnar v. Americana Hotels,* 65 Hawaii 370, 652 P.2d 625, 631 (1982); *Geary v. United States Steel Corp.,* 456 Pa. 171, 184, 319 A.2d 174, 180 (1974); *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081 (1984). The leading case recognizing a public policy exception to the at-will doctrine is *Palmateer v. International Harvester Co., supra,* which holds that an employee stated a cause of action for wrongful discharge when he claimed he was fired for supplying information to police investigating alleged criminal violations by a co-employee. Addressing the issue of what constitutes "clearly mandated public policy," the court stated:

> There is no precise definition of the term. In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the

State's constitution and statutes and, when they are silent, in its judicial decisions. Although there is no precise line of demarcation dividing matters that are the subject of public policies from matters purely personal, a survey of cases in other States involving retaliatory discharges shows that a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed.

85 Ill.2d at 130, 52 Ill.Dec. at 15–16, 421 N.E.2d at 878–79 (citation omitted).

Other courts have allowed a cause of action where an employee was fired for refusing to violate a specific statute. *E.g., Petermann v. Teamsters Local 396, supra* (declined to commit perjury before a legislative committee); *Tameny v. Atlantic Richfield Co.,* 164 Cal.Rptr. 839, 164 Cal. Rptr. 839, 610 P.2d 1330 (1980) (would not engage in price-fixing); *Sheets v. Teddy's Frosted Foods,* 179 Conn. 471, 427 A.2d 385 (1980) (insisted that employer comply with state Food, Drug, and Cosmetic Act); *Trombetta v. Detroit, Toledo & Ironton Railroad Co.,* 81 Mich.App. 489, 265 N.W.2d 385 (1978) (refused to alter state-mandated pollution control reports); *O'Sullivan v. Mallon,* 160 N.J.Super. 416, 390 A.2d 149 (1978) (would not perform medical procedure for which she was not licensed); *Harless v. First National Bank,* 162 W.Va. 116, 246 S.E.2d 270 (1978) (would not violate consumer protection law). Failure to perform an act which would violate provisions of the Oregon state constitution formed the basis for a cause of action in *Delaney v. Taco Time International,* 297 Or. 10, 681 P.2d 114 (1984) (declined to sign a false and arguably tortious statement

---

**3.** Although *Monge* held that the aggrieved employee had a cause of action for breach of her employment contract based on the employer's "bad faith," the New Hampshire Supreme Court later restricted the reach of *Monge,* construing it to apply "only to a situation where an employee is discharged because he performed an act that public policy would encourage, or refused to do that which public policy condemned." *Howard v. Dorr Woolen Co.,* 120 N.H. 295, 297, 414 A.2d 1273, 1274 (1980).

**4.** Twelve states have recognized a wrongful discharge cause of action for violation of public policy; fifteen additional states have acknowledged a willingness to consider it, if presented with appropriate facts. *See* Shepard & Moran, *"Wrongful" Discharge Litigation,* ILR Report (Fall 1982) and cases decided since the issuance of that report, including *Meredith v. C.E. Walther,* 422 So.2d 761 (Ala.1982); *Parnar v. Americana Hotels,* 65 Hawaii 370, 652 P.2d 625 (1982); *Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 335 N.W.2d 834 (1983).

regarding a co-employee). Similarly, courts have found terminations improper where to do otherwise would have impinged on the employee's exercise of statutory rights or duties. *E.g., Glenn v. Clearman's Golden Cock Inn*, 192 Cal.App.2d 793, 13 Cal.Rptr. 769 (1961) (right to join a union); *Midgett v. Sackett-Chicago*, 105 Ill.2d 143, 85 Ill.Dec. 475, 473 N.E.2d 1280 (1984) (filing of a workers' compensation claim by a union member protected by a collective bargaining agreement); *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973) (filing of a workers' compensation claim); *Nees v. Hocks, supra* (requesting not to be excused from jury duty). A division of our court of appeals recently adopted the public policy exception, ruling that the discharge of an at-will employee who refused to conceal a violation of Arizona's theft statute was contrary to public policy. *Vermillion v. AAA Pro Moving & Storage*, 146 Ariz. 215 at 216, 704 P.2d 1360 at 1361 (App.1985). The court's ruling, it stated, was the "logical conclusion" to draw from previous decisions of the court of appeals. *Id. See Daniel v. Magma Copper Co.*, 127 Ariz. 320, 620 P.2d 699 (App.1980); *Larsen v. Motor Supply Co.*, 117 Ariz. 507, 573 P.2d 907 (App.1977).

It is difficult to justify this court's further adherence to a rule which permits an employer to fire someone for "cause morally wrong." So far as we can tell, no court faced with a termination that violated a "clear mandate of public policy" has refused to adopt the public policy exception. Certainly, a court would be hard-pressed to find a rationale to hold that an employer could with impunity fire an employee who refused to commit perjury. Why should the law imply an agreement which would give the employer such power? It may be argued, of course, that our economic system functions best if employers are given wide latitude in dealing with employees. We assume that it is in the public interest that employers continue to have that freedom. We also believe, however, that the interests of the economic system will be fully served if employers may fire for good

cause or without cause. The interests of society as a whole will be promoted if employers are forbidden to fire for cause which is "morally wrong."

■ We therefore adopt the public policy exception to the at-will termination rule. We hold that an employer may fire for good cause or for no cause. He may not fire for bad cause—that which violates public policy. To the extent that it is contrary to the foregoing, we overrule *Dover Copper Mining Co. v. Doenges, supra.*

■ We turn then to the questions of where "public policy" may be found and how it may be recognized and articulated. As the expressions of our founders and those we have elected to our legislature, our state's constitution and statutes embody the public conscience of the people of this state. It is thus in furtherance of their interests to hold that an employer may not with impunity violate the dictates of public policy found in the provisions of our statutory and constitutional law.

We do not believe, however, that expressions of public policy are contained only in the statutory and constitutional law, nor do we believe that all statements made in either a statute or the constitution are expressions of public policy. Turning first to the identification of other sources, we note our agreement with the following:

> Public policy is usually defined by the political branches of government. Something "against public policy" is something that the Legislature has forbidden. But the Legislature is not the only source of such policy. In common-law jurisdictions the courts too have been sources of law, always subject to legislative correction, and with progressively less freedom as legislation occupies a given field. It is the courts, to give one example, that originated the whole doctrine that certain kinds of businesses—common carriers and innkeepers—must serve the public without discrimination or preference. In this sense, then, courts make law, and they have done so for years.

*Lucas v. Brown & Root,* 736 F.2d 1202, 1205 (8th Cir.1984). Other state courts have similarly recognized judicial decisions as a source of public policy. *E.g., Palmateer v. International Harvester Co.,* 85 Ill.2d at 130, 52 Ill.Dec. at 15, 421 N.E.2d at 878; *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 72, 417 A.2d 505, 512 (1980); *Thompson v. St. Regis Paper Co.,* 102 Wash.2d at 232–233, 685 P.2d at 1089. Thus, we believe that reliance on prior judicial decisions, as part of the body of applicable common law, is appropriate, although we agree with the Hawaii Supreme Court that "courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject." *Parnar v. Americana Hotels,* 65 Hawaii at 380, 652 P.2d at 631. Thus, we will look to the pronouncements of our founders, our legislature, and our courts to discern the public policy of this state.

■ All such pronouncements, however, will not provide the basis for a claim of wrongful discharge. Only those which have a singularly *public* purpose will have such force. Lord Truro set forth the classic formulation of the public policy doctrine nearly 150 years ago:

> Public policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be termed, as it sometimes has been, the policy of the law, or public policy in relation to the administration of the law.

*Egerton v. Earl Brownlow,* 4 H.L.Cas. 1, 196 (1853). Where the interest involved is merely private or proprietary, the exception does not apply. In *Pierce v. Ortho Pharmaceutical Corp., supra,* for instance, the court held that the plaintiff did not have a cause of action for wrongful discharge based on her refusal to do certain research, where she had failed to articulate a clear public policy that had been violated. Citing the personal nature of Dr. Pierce's opposition, the court stated:

> Chaos would result if a single doctor engaged in research were allowed to determine, according to his or her individual conscience, whether a project should continue. An employee does not have a right to continued employment when he or she refuses to conduct research simply because it would contravene his or her personal morals. An employee at will who refuses to work in answer to a call of conscience should recognize that other employees and their employer might heed a different call.

84 N.J. at 75, 417 A.2d at 514 (citation omitted). Although an employee facing such a quandary may refuse to do the work believed to violate her moral philosophy, she may not also claim a right to continued employment. *Id.* The Oregon Supreme Court announced a similar limitation when it refused to recognize a cause of action for the discharge of an employee who claimed he was wrongfully terminated for exercising his statutory right as a stockholder to examine the books of his corporate employer. *Campbell v. Ford Industries,* 274 Or. 243, 546 P.2d 141 (1976). The court based its determination on its finding that the right claimed was "not one of public policy, but the private and proprietary interest of stockholders, as owners of the corporation." *Id.* at 249–50, 546 P.2d at 145.

However, some legal principles, whether statutory or decisional, have a discernible, comprehensive public purpose. A state's criminal code provides clear examples of such statutes. Thus, courts in other jurisdictions have consistently recognized a cause of action for a discharge in violation of a criminal statute. In a seminal case involving the public policy exception, *Petermann v. International Brotherhood of Teamsters Local 396,* 174 Cal.App.2d 184, 344 P.2d 25 (1959), the California Court of Appeals upheld an employee's right to refuse to commit perjury, stating:

> The public policy of this state as reflected in the Penal Code ... would be seriously impaired if it were to be held that one could be discharged by reason of his refusal to commit perjury. To hold that one's continued employment

could be made contingent upon his commission of a felonious act at the instance of his employer would be to encourage criminal conduct upon the part of both the employee and employer and would serve to contaminate the honest administration of public affairs. This is patently contrary to the public welfare.

*Id.* at 189, 344 P.2d at 27.

Although we do not limit our recognition of the public policy exception to cases involving a violation of a criminal statute, we do believe that our duty will seldom be clearer than when such a violation is involved. We agree with the Illinois Supreme Court that "[t]here is no public policy more basic, nothing more implicit in the concept of ordered liberty, than the enforcement of a State's criminal code." *Palmateer v. International Harvester Co.*, 85 Ill.2d at 132, 52 Ill.Dec. at 16, 421 N.E.2d at 879 (citations omitted).

■■■ In the case before us, Wagenseller refused to participate in activities which arguably would have violated our indecent exposure statute, A.R.S. § 13–1402. She claims that she was fired because of this refusal. The statute provides:

§ 13–1402. Indecent exposure; classifications

A. A person commits indecent exposure if he or she exposes his or her genitals or anus or she exposes the areola or nipple of her breast or breasts and another person is present, and the defendant is reckless about whether such other person, as a reasonable person, would be offended or alarmed by the act.

B. Indecent exposure is a class 1 misdemeanor. Indecent exposure to a person under the age of fifteen years is a class 6 felony.

While this statute may not embody a policy which "strikes at the heart of a citizen's social right, duties and responsibilities" (*Palmateer, supra*) as clearly and forcefully as a statute prohibiting perjury, we believe that it was enacted to preserve and protect the commonly recognized sense of public privacy and decency. The statute does, therefore, recognize bodily privacy as a "citizen's social right." We disagree with the court of appeals' conclusion that a minor violation of the statute would not violate public policy. (Slip op. at 6.) The nature of the act, and not its magnitude, is the issue. The legislature has already concluded that acts fitting the statutory description contravene the public policy of this state. We thus uphold this state's public policy by holding that termination for refusal to commit an act which might violate A.R.S. § 13–1402 may provide the basis of a claim for wrongful discharge. The relevant inquiry here is not whether the alleged "mooning" incidents were either felonies or misdemeanors or constituted purely technical violations of the statute, but whether they contravened the important public policy interests embodied in the law. The law enacted by the legislature establishes a clear policy that public exposure of one's anus or genitals is contrary to public standards of morality. We are compelled to conclude that termination of employment for refusal to participate in public exposure of one's buttocks [5] is a termination contrary to the policy of this state, even if, for instance, the employer might have grounds to believe that all of the onlookers were voyeurs and would not be offended. In this situation, there might be no crime, but there would be a violation of public policy to compel the employee to do an act ordinarily proscribed by the law.

From a theoretical standpoint, we emphasize that the "public policy exception" which we adopt does not require the court to make a new contract for the parties. In

---

5. We have little expertise in the techniques of mooning. We cannot say as a matter of law, therefore, whether mooning would always violate the statute by revealing the mooner's anus or genitalia. That question could only be determined, we suppose, by an examination of the facts of each case. We deem such an inquiry unseemly and unnecessary in a civil case. Compelled exposure of the bare buttocks, on pain of termination of employment, is a sufficient violation of the *policy* embodied in the statute to support the action, even if there would have been no technical violation of the statute.

an at-will situation, the parties have made no express agreement regarding the duration of employment or the grounds for discharge. The common law has presumed that in so doing the parties have intended to allow termination at any time, with or without good cause. It might be more properly argued that the law has recognized an implied covenant to that effect. Whether it be presumption or implied contractual covenant, we do not disturb it. We simply do not raise a presumption or imply a covenant that would require an employee to do that which public policy forbids or refrain from doing that which it commands.

Thus, in an at-will hiring we continue to recognize the presumption or to imply the covenant of termination at the pleasure of either party, whether with or without cause. Firing for bad cause—one against public policy articulated by constitutional, statutory, or decisional law—is not a right inherent in the at-will contract, or in any other contract, even if expressly provided. *See 1 A. Corbin, Contracts* § 7; 6A *A. Corbin, Contracts* §§ 1373–75 (1962). Such a termination violates rights guaranteed to the employee by law and is tortious. *See Prosser & Keeton on Torts* § 92 at 655 (5th ed. 1984).

### THE "PERSONNEL POLICY MANUAL" EXCEPTION

Although an employment contract for an indefinite term is presumed to be terminable at will, that presumption, like any other presumption, is rebuttable by contrary evidence. *See* Restatement (Second) of Agency § 442; *Leikvold v. Valley View Community Hospital*, 141 Ariz. 544, 547, 688 P.2d 170, 173 (1984). Thus, in addition to relying on the public policy analysis to restrict the operation of the terminable-at-will rule, courts have turned to the employment contract itself, finding in it

implied terms that limit the employer's right of discharge. Two types of implied contract terms have been recognized by the courts: implied-in-law terms and implied-in-fact terms. An implied-in-law term arises from a duty imposed by law where the contract itself is silent; it is imposed even though the parties may not have intended it, and it binds the parties to a legally enforceable duty, just as if they had so contracted explicitly. 1 *A. Corbin, Contracts* § 17, at 38 (1960). The covenant of good faith and fair dealing, discussed *post* at 1038–1041, is an implied-in-law contract term that has been recognized by a small number of courts in the employment-at-will context.

An implied-in-fact contract term, on the other hand, is one that is inferred from the statements or conduct of the parties. *Id.* It is not a promise defined by the law, but one made by the parties, though not expressly. Courts have found such terms in an employer's policy statements regarding such things as job security and employee disciplinary procedures, holding that by the conduct of the parties these statements may become part of the contract, supplementing the verbalized at-will agreement, and thus limiting the employer's absolute right to discharge an at-will employee.[6] *Toussaint v. Blue Cross & Blue Shield of Michigan, supra; Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn.1983). Arizona is among the jurisdictions that have recognized the implied-in-fact contract term as an exception to the at-will rule. In *Leikvold v. Valley View Community Hospital, supra,* this court held that a personnel manual can become part of an employment contract and remanded the cause for a jury determination as to whether the particular manual given to Leikvold had become part of her employ-

---

6. One commentator predicts that this exception to the operation of the at-will rule will be "more pervasive and perilous" than the currently more widely recognized public policy exception. Lopatka, *supra,* at 17. Until recently, neither employers nor the courts have treated employer representations regarding job security and other employment matters as creating binding contracts. Employers have made such statements without an awareness of the possible consequences, and their workplaces are thus "rife with potentially actionable 'promises.'" *Id.*

ment contract with Valley View. 141 Ariz. at 548, 688 P.2d at 174.

The relevant facts in the case before us are not dissimilar to those in *Leikvold.* In October 1978, Scottsdale Memorial Hospital established a four-step disciplinary procedure to achieve the Hospital's stated policy of "provid[ing] fair and consistent discipline as required to assist with the improvement of employees' behavior or performance." Subject to 32 listed exceptions, prior to being terminated a Hospital employee must be given a verbal warning, a written performance warning, a letter of formal reprimand, and a notice of dismissal. The manual further qualifies the mandatory procedure by providing that the 32 exceptions "are not inclusive and are only guidelines." In appealing her dismissal, Wagenseller cited violations of this procedure, but the trial court ruled as a matter of law that the manual had not become part of the employment contract between Wagenseller and the Hospital. The court of appeals held that the Hospital's failure to follow the four-step disciplinary procedure did not violate Wagenseller's contract rights because she failed to prove her reliance on the procedure as a part of her employment contract. (Slip op. at 14.) We disagree with both of these rulings.

First, we need look only to *Leikvold* for the rule governing the determination of whether a particular statement by an employer becomes a part of an employment contract:

Whether any particular personnel manual modifies any particular employment-at-will relationship and becomes part of the particular employment contract is a *question of fact.* Evidence relevant to this factual decision includes the language used in the personnel manual as well as the employer's course of conduct and oral representations regarding it.

141 Ariz. at 548, 688 P.2d at 174 (emphasis added). Thus, we held in *Leikvold* that entry of summary judgment was inappropriate "[b]ecause a material question— whether the policies manual was incorporated into and became part of the terms of

the employment contract—remain[ed] in dispute." *Id.* The court may determine as a matter of law the proper construction of contract terms which are "clear and unambiguous." *Id.* Here, the court of appeals ruled, in effect, that the Hospital had adequately disclaimed any liability for failing to follow the procedure it had established. It found this disclaimer in the final item in the Hospital's list of exceptions to its disciplinary procedure: "20. These major and minor infractions are not inclusive and are only guidelines." The court concluded that the effect of this "clear" and "conspicuous" provision was "to create, by its terms, no rights at all." (Slip op. at 14.)

We do not believe this document, read in its entirety, has the clarity that the court of appeals attributed to its individual portions. One reading the document might well infer that the Hospital had established a procedure that would generally apply in disciplinary actions taken against employees. Although such a person would also note the long list of exceptions, he might not conclude from reading the list that an exception would apply in every case so as to swallow the general rule completely. We do not believe that the provision for unarticulated exceptions destroys the entire articulated general policy as a matter of law. Not only does such a result defy common sense, it runs afoul of our reasoning in *Leikvold,* where we addressed this problem directly:

Employers are certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason. Such actions, either not issuing a personnel manual or issuing one with clear language of limitation, instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual. However, if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, en-

courages reliance thereon, the employer cannot be free to only selectively abide by it. Having announced a policy, the employer may not treat it as illusory. 141 Ariz. at 548, 688 P.2d at 174.

We emphasize here that the rule set forth in *Leikvold* is merely a reiteration of employment law as it has existed for centuries, exemplified by the English common law one-year presumption (*see ante* at 1030) and the at-will employment doctrine itself. The right of discharge without cause is an implied contractual term which is said to exist in an at-will relationship when there are no factual indications to the contrary. The intent to create a different relationship, as well as the parameters of that relationship, are to be discerned from the totality of the parties' statements and actions regarding the employment relationship. *Leikvold*, 141 Ariz. at 548, 688 P.2d at 174.

The general rule is that the determination whether in a particular case a promise should be implied in fact is a question of fact. 1 A. *Corbin, supra*, § 17 at 38; *see also Leikvold*, 141 Ariz. at 548, 688 P.2d at 174. Where reasonable minds may draw different conclusions or inferences from undisputed evidentiary facts, a question of fact is presented. *Dietz v. Waller*, 141 Ariz. 107, 110–111, 685 P.2d 744, 747–48 (1984). "[T]he very essence of [the jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable." *Apache Railway Co. v. Shumway*, 62 Ariz. 359, 378, 158 P.2d 142, 150 (1945). We believe that reasonable persons could differ in the inferences and conclusions they would draw from the Hospital's published manual regarding disciplinary policy and procedure. Thus, there are questions of fact as to whether this policy and procedure became a part of Wagenseller's employment contract. *See Leikvold*, 141 Ariz. at 548, 688 P.2d at 174. The trial court therefore erred in granting summary judgment on this issue.

The court of appeals' resolution of the reliance issue also was incorrect. A party may enforce a contractual provision without showing reliance. *Leikvold* does not require a plaintiff employee to show reliance in fact. The employee's reliance on an announced policy is only one of several factors that are relevant in determining whether a particular policy was intended by the parties to modify an at-will agreement. The employer's course of conduct and oral representations regarding the policy, as well as the words of the policy itself, also may provide evidence of such a modification. *Leikvold*, 141 Ariz. at 548, 688 P.2d at 174.

## THE "GOOD FAITH AND FAIR DEALING" EXCEPTION

We turn next to a consideration of implied-in-law contract terms which may limit an employer's right to discharge an at-will employee. Wagenseller claims that discharge without good cause breaches the implied-in-law covenant of good faith and fair dealing contained in every contract. *See* Restatement (Second) of Contracts § 205; *Savoca Masonry Co. v. Homes & Son Construction Co.*, 112 Ariz. 392, 396, 542 P.2d 817, 821 (1975). *See also* 3 A. *Corbin, supra*, § 541 at 97; 5 S. *Williston, The Law of Contracts* § 670 at 159 (3d ed. 1961). In the context of this case, she argues that discharge without good cause violates the covenant of good faith and is, therefore, wrongful. The covenant requires that neither party do anything that will injure the right of the other to receive the benefits of their agreement. *Comunale v. Traders & General Insurance Co.*, 50 Cal.2d 654, 658, 328 P.2d 198, 200 (1958); *Fortune v. National Cash Register Co.*, 373 Mass. 96, 104, 364 N.E.2d 1251, 1257 (1977). The duty not to act in bad faith or deal unfairly thus becomes a part of the contract, and, as with any other element of the contract, the remedy for its breach generally is on the contract itself. *Zancanaro v. Cross*, 85 Ariz. 394, 339 P.2d 746 (1959). In certain circumstances, breach of contract, including breach of the covenant of good faith and fair dealing, may provide the basis for a tort claim. *Noble v. Na-*

*tional American Life Insurance Co.,* 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981); *Seamen's Direct Buying Service v. Standard Oil Co. of California,* 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984); *Wallis v. Superior Court,* 160 Cal.App.3d 1109, 207 Cal.Rptr. 123 (1984); *Gates v. Life of Montana Insurance Co.,* 638 P.2d 1063 (Mont.1982).

The question whether a duty to terminate only for good cause should be implied into all employment-at-will contracts has received much attention in the case law and other literature. *See, e.g., Pugh v. See's Candies,* 116 Cal.App.3d 311, 171 Cal.Rptr. 917 (1981); *Fortune v. National Cash Register Co., supra; Thompson v. St. Regis Paper Co., supra; Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 335 N.W.2d 834 (1983); Diamond, *The Tort of Bad Faith Breach of Contract: When, If at All, Should It Be Extended Beyond Insurance Transactions?* 64 Marq.L.Rev. 425 (1981); Murg & Scharman, *supra,* at 361–67. Courts have generally rejected the invitation to imply such a duty in employment contracts, voicing the concern that to do so would place undue restrictions on management and would infringe the employer's "legitimate exercise of management discretion." *Pugh v. See's Candies,* 116 Cal.App.3d at 330, 171 Cal.Rptr. at 928. *See also Parnar v. Americana Hotels,* 65 Hawaii at 377, 652 P.2d at 629; *Thompson v. St. Regis Paper Co.,* 102 Wash.2d at 226–227, 685 P.2d at 1086; *Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d at 569, 335 N.W.2d at 838. We think this concern is appropriate.

California has come closer than any other jurisdiction to implying a good cause

duty in all employment-at-will contracts.[7] The case most often cited for this rule is *Cleary v. American Airlines,* 111 Cal. App.3d 443, 168 Cal.Rptr. 722 (1980). In *Cleary,* the plaintiff was discharged after eighteen years of employment with the defendant. He alleged that the discharge violated both an express policy of the company regarding employee grievances and the implied covenant of good faith and fair dealing. *Id.* at 448, 168 Cal.Rptr. at 725. The court agreed:

> Termination of employment without legal cause after such a period of time offends the implied-in-law covenant of good faith and fair dealing contained in all contracts, including employment contracts. As a result of this covenant, a duty arose on the part of the employer ... to do nothing which would deprive plaintiff, the employee, of the benefits of the employment bargain—benefits described in the complaint as having accrued during plaintiff's 18 years of employment.

*Id.* at 455, 168 Cal.Rptr. at 729. Thus, the court held that the employer could not discharge this employee without good cause, based on both the longevity of the employee's service and the express policy of the employer. *Id.* If the plaintiff could sustain his burden of proving that he had been terminated unjustly, the court held further that his cause of action would sound in tort as well as contract. *Id.* Only one other court has allowed a tort recovery for breach of the implied covenant of good faith in an employment contract, and, in that case as well as in *Cleary,* the court relied in part upon the existence of an employee handbook on which plaintiff had relied. *Gates v. Life of Montana Insur-*

7. Some courts trace the recognition of the good faith covenant in employment-at-will contracts to *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977). We do not read *Fortune* so broadly. In *Fortune,* the plaintiff salesman received a notice of termination the first working day after the company received a $5 million order on which plaintiff was entitled to a substantial commission. By the terms of an express "bonus" agreement between the salesman and the company, he was not eligible to receive the full bonus until actual delivery and installation of the product, which occurred well after his termination. Plaintiff brought suit to recover the commissions allegedly due to him. In upholding the jury's award of the commissions to plaintiff, the Supreme Judicial Court of Massachusetts relied, not on the implied covenant of good faith, but upon the express contract itself, stating that it need not "speculate as to whether the good faith requirement is implicit in every contract for employment at will." *Id.* at 104, 364 N.E.2d at 1257.

*ance Co., supra. Cf. Moore v. Home Insurance Co.,* 601 F.2d 1072 (9th .Cir.1979) (applying Arizona law, court held that the good faith duty did not limit employment discharges to those for which good cause could be shown).

Tort recovery for breach of the implied covenant of good faith and fair dealing is well established in actions brought on insurance contracts. *See, e.g., Noble v. National American Life Insurance Co., supra; Gruenberg v. Aetna Insurance Co.,* 108 Cal.Rptr. 480, 510 P.2d 1032 (1973). Courts have been reluctant, however, to extend the tort action beyond the insurance setting. The rationale for permitting tort recovery in insurance contract disputes and not in disputes involving other contracts has been founded largely upon the existence of a "special relationship" between insurer and insured. *See Egan v. Mutual of Omaha Insurance Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141 (1979). The California Court of Appeals recently found such a relationship present in the breach of an employment contract and held that the employee had stated a claim in tort for breach of the covenant of good faith and fair dealing. *Wallis v. Superior Court,* 160 Cal.App.3d at 1119–1122, 207 Cal.Rptr. at 129.

We find neither the logic of the California cases nor their factual circumstances compelling for recognition of so broad a rule in the case before us. Were we to adopt such a rule, we fear that we would tread perilously close to abolishing completely the at-will doctrine and establishing by judicial fiat the benefits which employees can and should get *only* through collective bargaining agreements or tenure provisions. *Cf. Fleming v. Pima County,* 141 Ariz. 149, 685 P.2d 1301 (1984) (county employee protected by a merit system was permitted to bring a tort action for wrongful discharge). While we do not reject the propriety of such a rule, we are not persuaded that it should be the result of judicial decision.

In reaching this conclusion, however, we do not feel that we should treat employment contracts as a special type of agreement in which the law refuses to imply the covenant of good faith and fair dealing that it implies in all other contracts. As we noted above, the implied-in-law covenant of good faith and fair dealing protects the right of the parties to an agreement to receive the benefits of the agreement that they have entered into. The denial of a party's right to those benefits, whatever they are, will breach the duty of good faith implicit in the contract. Thus, the relevant inquiry always will focus on the contract itself, to determine what the parties did agree to. In the case of an employment-at-will contract, it may be said that the parties have agreed, for example, that the employee will do the work required by the employer and that the employer will provide the necessary working conditions and pay the employee for work done. What cannot be said is that one of the agreed benefits to the at-will employee is a guarantee of continued employment or tenure. The very nature of the at-will agreement precludes any claim for a prospective benefit. Either employer or employee may terminate the contract at any time.

We do, however, recognize an implied covenant of good faith and fair dealing in the employment-at-will contract, although that covenant does not create a duty for the employer to terminate the employee only for good cause. The covenant does not protect the employee from a "no cause" termination because tenure was never a benefit inherent in the at-will agreement. The covenant does protect an employee from a discharge based on an employer's desire to avoid the payment of benefits already earned by the employee, such as the sales commissions in *Fortune, supra,* but not the tenure required to earn the pension and retirement benefits in *Cleary, supra.* Thus, plaintiff here has a right to receive the benefits that were a part of her employment agreement with defendant Hospital. To the extent, however, that the benefits represent a claim for prospective employment, her claim must fail. The terminable-at-will contract be-

tween her and the Hospital made no promise of continued employment. To the contrary, it was, by its nature, subject to termination by either party at any time, subject only to the legal prohibition that she could not be fired for reasons which contravene public policy.

Thus, because we are concerned not to place undue restrictions on the employer's discretion in managing his workforce and because tenure is contrary to the bargain in an at-will contract, we reject the argument that a no cause termination breaches the implied covenant of good faith and fair dealing in an employment-at-will relationship.

### THE INTERFERENCE WITH CONTRACT CLAIM

In addition to her claims against Scottsdale Memorial Hospital, Wagenseller argued that she had stated a cause of action against her supervisor, defendant Smith, for intentional interference with her employment relationship with the Hospital. The court of appeals ruled in Wagenseller's favor and remanded to the trial court, finding that court's grant of summary judgment for Smith on the interference claim improper because "disputed inferences arise from the facts of this case." (Slip op. at 26.) We approve this result, but do not agree with some of the legal conclusions articulated by the court of appeals.

We briefly summarize the current state of Arizona law on tortious interference with a contractual relationship. In *Meason v. Ralston Purina Co.*, 56 Ariz. 291, 107 P.2d 224 (1940), we recognized a cause of action for wrongful interference with a sales contract. We have since allowed a cause of action for interference with a lease agreement, *Tipton v. Burson*, 73 Ariz. 144, 238 P.2d 1098 (1951), for inducing breach of a restrictive covenant, *McNutt Oil & Refining Co. v. D'Ascoli*, 79 Ariz. 28, 281 P.2d 966 (1955), for interference with an agency contract, *Chanay v. Chittenden*, 115 Ariz. 32, 563 P.2d 287 (1977), and for interference with business relationships, *Antwerp Diamond Ex-*

*change v. Better Business Bureau of Maricopa County*, 130 Ariz. 523, 637 P.2d 733 (1981). We have stated the elements of the tort as follows:

(1) The existence of a valid contractual relationship or business expectancy;

(2) knowledge of the relationship or expectancy on the part of the interferer;

(3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

(4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Antwerp Diamond Exchange*, 130 Ariz. at 530, 637 P.2d at 730 (quoting *Calbom v. Knudtzon*, 65 Wash.2d 157, 162–63, 396 P.2d 148, 153–54 (1964)).

Defendant Smith first argues that there can be no wrongful interference with an at-will employment contract because there can be no tort for inducing the employer to do what it had a legal right to do—fire the employee without cause. This argument, of course, overlooks the possibility that plaintiff was fired for "bad cause," something which the employer had no legal right to do. In any event, we see no reason for applying a different rule to at-will contracts. As early as 1915, the United States Supreme Court, in a case originating in Arizona, acknowledged an important limitation on the at-will rule:

The fact that the employment is at the will of the parties, respectively, does not make it at the will of others. The employee has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion and, by the weight of authority, the unjustified interference of third persons is actionable although the employment is at will.

*Truax v. Raich*, 239 U.S. 33, 38, 36 S.Ct. 7, 9, 60 L.Ed. 131 (1915). By 1939, the common law, as stated by the American Law Institute, recognized liability for interference with contracts terminable at will. Restatement of Torts § 766, comment *c*. This rule has not changed; until an at-will contract is terminated, it is "valid and subsist-

ing, and the defendant may not *improperly* interfere with it." Restatement (Second) of Torts § 766, comment *g* (emphasis supplied). Thus, a cause of action in tort is available to a party to any contract, at-will or otherwise, when a third party improperly and intentionally interferes with the performance of that contract.

Defendant argues, however, that she had a "privilege" so to interfere. The court of appeals stated four conclusions regarding the circumstances in which such a privilege would be recognized:

1. If a supervisor has the absolute authority to fire an employee without consulting superiors the discharged employee has no cause of action....

2. If a supervisor (not having absolute authority to fire) acts solely to further his private advantage and not to further the interests of the employer, the privilege does not apply....

3. If a supervisor (not having the sole authority to fire) acts purely out of malice and ill will with no interest of the corporation in mind, the privilege does not apply....

4. Where the statements of the supervisor that caused the employee's termination are false and defamatory and made with actual malice the privilege does not apply....

(Slip op. at 23–24.) We disapprove this statement of the rules of privilege for the reasons discussed below.

First, we do not believe that the "privilege" of a supervisor to interfere in an employment relationship is nearly so sharply delineated as the court of appeals' conclusions would suggest. Indeed, the question whether to denominate such rules as matters of "privilege" is a subject of much dispute in the literature. *See* Dobbs, *Tortious Interference with Contractual Relationships*, 34 Ark.L.Rev. 335, 345–46 (1980); Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U.Chi.L.Rev. 61, 65–68 (1982); Note, *Interference with Economic Relations of Attorneys*, 23 Washburn L.J. 528, 537–39

(1984). While "[i]t has always been agreed that a defendant might intentionally interfere with the plaintiff's interests without liability *if there were good grounds for the interference*," it is also true that "[d]ifferent formulas to express this idea have been in use at different stages in the development of the tort." *Prosser and Keeton on Torts* § 129 at 983 (5th ed.1984) (emphasis added).

Three distinct formulations are apparent. The first is the requirement that the interferer act with "malice," in the sense of an intent to commit a *wrongful* act. *Id.* at 983 n. 56. Under the second formulation, liability is imposed for any intentional and *unjustified* interference resulting in harm to the plaintiff. The burden of proving justification is placed on the defendant, an approach criticized for its imposition of liability on the defendant "without first describing to him what was forbidden and what was permitted." *Id.* § 129 at 983. The third, and most recent, formulation is that adopted by the Restatement (Second) of Torts. The Restatement approach subjects the defendant to liability for interference only if his acts were "improper": "One who intentionally and *improperly* interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other...." Restatement (Second) of Torts § 766 (emphasis supplied). Whether a particular action is improper is determined by a consideration of seven factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Id.* § 767. A comment to this section explains the Restatement's rejection of the prima facie tort-privilege characterization:

> Unlike other intentional torts such as intentional injury to person or property, or defamation, this branch of tort law has not developed a crystallized set of definite rules as to the existence or nonexistence of a privilege to act.... Because of this fact, this Section is expressed in terms of whether the interference is improper or not, rather than in terms of whether there was a specific privilege to act in the manner specified.

*Id.,* comment *b.*

 We believe the Restatement approach most accurately reflects the tort of interference with contractual relations as it exists today. We concur in the Restatement's rejection of the formalistic privilege concept in favor of a requirement that an interference be "improper" for liability to attach. It is difficult to see anything defensible, in a free society, in a rule that would impose liability on one who honestly persuades another to alter a contractual relationship. *See* Dobbs, *supra;* Perlman, *supra.* We find nothing inherently wrongful in "interference" itself. If the interferer is to be held liable for committing a wrong, his liability must be based on more than the act of interference alone. Thus, there is ordinarily no liability absent a showing that defendant's actions were improper as to motive or means.

We therefore adopt the Restatement's required showing of an "improper" interference. In addition to proving the four elements stated in *Antwerp, supra,* the plaintiff bringing a tortious interference action must show that the defendant acted improperly. The factors enumerated in § 767 of the Restatement will form the basis for consideration of this element of the tort. If the plaintiff is unable to show the impropriety of the defendant's conduct based on an examination of these factors, the conduct is not tortious.

 The court of appeals' statement of the rules of privilege (*ante* at 1042) is of no avail to the defendant who has been shown to have improperly interfered. Three of the circumstances stated by the court—acting for purely private advantage, acting maliciously, and making false and defamatory statements—are merely facets of the element of impropriety that the plaintiff may show in a particular case. We reject the first rule stated by the court of appeals—according an absolute privilege to a supervisor who has absolute authority to fire—for other reasons. First, our research on this issue has revealed no authority outside the state of Georgia for such a rule. *See Cummings v. Walsh,* 561 F.Supp. 872 (S.D.Ga.1983); *Georgia Power Co. v. Busbin,* 242 Ga. 612, 250 S.E.2d 442 (1978); *Rhodes v. Levitz Furniture Co.,* 136 Ga.App. 514, 221 S.E.2d 687 (1975). Even if we were to adopt the court of appeals' conclusions in general, which we do not, we would still be constrained to reject this particular conclusion. We do not find compelling a rule of law that only one state has adopted and that runs counter to the views of the scholars in the field. *See* Dobbs, *supra;* Perlman, *supra.* We also see no policy justification for such a rule, as it would effectively grant permission to a supervisor to act, even with the worst of motives and methods, with impunity. To adopt such a rule would place the supervisor beyond the inhibitions of tort law. We decline to endorse such a rule.

 We are presented here with an appeal from a grant of summary judgment; therefore, we view the facts in the light most favorable to the party against whom judgment was taken. *Gulf Insurance Co. v. Grisham,* 126 Ariz. 123, 124, 613 P.2d 283, 284 (1980). The trial court ruled against the plaintiff Wagenseller. Evidence was before the court on each of the five elements of the cause of action listed and discussed *ante* at 1041 and 1043. Three of these elements exist without question of fact. The evidence does present a genuine dispute as to two elements of the tort, however—whether Smith *intentionally* and *improperly* interfered with the employment relationship between Wagenseller and the Hospital. Therefore, the trial

court's grant of summary judgment against Wagenseller on this claim was inappropriate. *Leikvold*, 141 Ariz. 544, 548, 688 P.2d 170, 174 (1984).

## SUMMARY AND CONCLUSIONS

The trial court granted summary judgment against Wagenseller on the count alleging the tort of wrongful discharge in violation of public policy. We adopt the "public policy" exception to the at-will termination rule and hold that the trial court erred in granting judgment against plaintiff on this theory. On remand plaintiff will be entitled to a jury trial if she can make a prima facie showing that her termination was caused by her refusal to perform some act contrary to public policy, or her performance of some act which, as a matter of public policy, she had a right to do. The obverse, however, is that mere dispute over an issue involving a question of public policy is not equivalent to establishing causation as a matter of law and will not automatically entitle plaintiff to judgment. In the face of conflicting evidence or inferences as to the actual reason for termination, the question of causation will be a question of fact.

The trial court granted summary judgment against Wagenseller on the count alleging breach of implied-in-fact provisions of the contract. We hold that this was error. On this record, there is a jury question as to whether the provisions of the employment manual were part of the contract of employment.

We affirm the grant of summary judgment on the count seeking recovery for breach of the implied covenant of good faith and fair dealing. We recognize that covenant as part of this and other contracts, but do not construe it to give either party to the contract rights—such as tenure—different from those for which they contracted.

We reverse the grant of summary judgment against Wagenseller on the count alleging tortious interference with a con-

tractual relationship. On this record, there is a question of fact with respect to whether the discharge was tortious. Summary judgment was inappropriate.

For the foregoing reasons, we affirm in part and reverse in part. The decision of the court of appeals is vacated and the case remanded to the trial court for proceedings not inconsistent with this opinion.

GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.

HOLOHAN, Chief Justice, dissenting and specially concurring.

The Court of Appeals held in this case that the personnel manual was not, as a matter of law, part of the employment contract. I concur in that position because I find the analysis of the Court of Appeals more convincing than that advanced by the majority of this court. I, therefore, dissent from the opinion of the court on that issue.

On the remaining issues I concur in the result.

## SUPPLEMENTAL OPINION

FELDMAN, Justice.

This supplemental opinion concerns plaintiff's request for attorney's fees on appeal and review pursuant to A.R.S. § 12–341.01 and *Wenk v. Horizon Moving & Storage Co.*, 131 Ariz. 131, 639 P.2d 321 (1982). We granted review under Rule 23(f), Ariz.R. Civ.App.P., 17A A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24. We consider two issues with regard to fee awards to a successful appellant:

(1) Under Rule 21(c) Ariz.R.Civ.App.P.,[1] 17A A.R.S., does "briefs on appeal" include petitions for review, and does "oral argument" include the argument on the petition for review?

(2) Is a party who successfully appeals the trial court's grant of summary judgment, but gains only the right to trial, a "successful party" on appeal, entitled to

---

1. The Rules of Civil Appellate Procedure, 17A A.R.S., will be referred to as "Rule ——."

attorney's fees under A.R.S. § 12–341.01?

## FACTS

A full account of the facts is contained in *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 710 P.2d 1025 (1985). We give only those facts necessary to the resolution of the issues we address in this supplemental opinion. After being fired, Catherine Sue Wagenseller (plaintiff) brought an action against her former employer, Scottsdale Memorial Hospital. Plaintiff alleged five counts arising out of the termination of her at-will employment contract. Prior to the scheduled jury trial the trial court granted defendant's motions for summary judgment on three of the counts. On the first day of trial, the trial court ruled against plaintiff on the remaining counts. Both parties had properly requested attorney's fees under § 12–341.01 in their pleadings as required by Rule 3.7(e)(1), Super.Ct. Local Prac.Rules, Maricopa County, 17A A.R.S. The trial court granted defendant $2,000 in attorney's fees as the successful party.

■ Plaintiff appealed the adverse judgment to the court of appeals. She did not request attorney's fees as provided by Rule 21(c)(1), which requires that applications for counsel fees be made prior to the submission of the appeal. The court of appeals ruled against plaintiff on four of the five counts. Plaintiff then petitioned for review to this court, but did not request an allowance of fees in the petition for review or by motion before oral argument. Our decision vacated the opinion of the court of appeals and reversed the judgment of the trial court on four of the five counts. Because no request was made to award counsel fees, our decision made no reference to the subject. After the decision plaintiff filed a statement of costs in which she included her request for attorney's fees. No rule expressly governs the procedure for seeking an allowance of attorney's fees on petitions for review. The proce-

dure set out in Rule 21(c) speaks to appeals: parties must submit their fee requests in their "briefs on *appeal*" or in motions filed "prior to oral argument or submission of the *appeal*" (emphasis added). If the rule's application is restricted to appeals, parties who petition this court for review or who respond to such petitions will be denied guidance on how and when to submit requests for attorney's fees. There is no reason for such a denial. Because these rules are to be construed liberally in furtherance of justice, Rule 3, we hold in accordance with Ariz.Const. art. 6, § 5(4) and (5), that the procedures of Rule 21(c) apply to proceedings on a petition for review as well as to appeals.

## TIMELINESS OF ATTORNEY'S FEE REQUESTS IN PROCEEDINGS ON PETITION FOR REVIEW

■ A request for attorney's fees is timely under Rule 21(c) if it is made in the briefs or prior to the submission of the appeal. Rule 21 does not contemplate that an initial request for allowance of fees should be made in the statement of costs after decision as was done in the present case. It merely provides that if the court has awarded fees, the successful party may seek a determination of the specific amount as part of its statement of costs filed after decision pursuant to Rule 21(a).

Plaintiff concedes that a request for allowance of fees made for the first time in a statement of costs is untimely, but argues that her failure to request fees in a timely fashion was attributable to the lack of correspondence between the procedure contemplated by Rule 21(c)(1) and the actual procedure involved in petitioning for review by the Arizona Supreme Court. Plaintiff claims that petitions for review are not the "briefs" referred to by Rule 21(c) because if this court grants review, it may still order the parties to file additional briefs. *See* Rule 23(f). Plaintiff similarly claims that because her oral argument took place before we granted review,[2] it could not be

---

**2.** Rule 23(f) contemplates that this court may hear oral argument after review has been grant-

the "oral argument" referred to by the rule. Arguing that the procedure followed in this case did not fall strictly within Rule 21(c), plaintiff urges this court to exercise its power under Rule 3 and to suspend the procedural requirements of Rule 21(c).

█ Statutes and common law practices that require the losing party to pay the successful party's attorney's fees are contrary to traditional American jurisprudence. Under the so-called American rule, counsel fees are not regarded as "costs" and each party to litigation generally bears its own attorney's fees regardless of who prevails. *State v. Boykin*, 112 Ariz. 109, 113, 538 P.2d 383, 387 (1975). Over the years, especially in this century, courts and legislatures have fashioned exceptions to this rule. These exceptions are commonly intended 1) to encourage private enforcement of public laws by victims, 2) to discourage non-meritorious litigation, 3) to encourage a just claim or a just defense, or 4) to promote settlement of disagreements out of court. Fee shifting under A.R.S. § 12–341.01(A) serves the last three purposes. Senate Committee on Judiciary, Minutes of Meeting, Mar. 29, 1976 on S.B. 1243 (explanation of Sen. Walsh that the provision "would bring Arizona more in line with a portion of the British system where they have less litigation than the United States"); *see also*, Rambow, *Statutory Attorney's Fees in Arizona: An Analysis of A.R.S. Section 12–341.01*, 24 ARIZ.L.REV. 659, 661 (1982). Unless each party is on notice *before* each stage of the law suit that its opponent intends to ask for attorney's fees, the last purpose cannot be served. To this end, and to spare courts from considering each case twice—once on the merits and once on the question of fees—local Superior Court Rule 3.7(e) and appellate Rule 21(c) require notice of the fee request before trial or submission of

the appeal respectively. Because parties who petition this court for review under Rule 23 may never have the opportunity to submit "additional briefs," we hold that "briefs" in Rule 21(c) include petitions for review by this court.

█ Because it is unlikely that petitioners will have two oral arguments before this court, we also hold that "oral argument" includes any oral argument whether prior to or after our grant of review. Thus, to be timely under Rule 21(c) on petitions for review by this court, the request for attorney's fees must be made either in the petition for review, the response thereto or by separate written motion filed and served prior to oral argument.

We have not previously addressed timeliness of fee requests on petitions for review in this court. Because of the confusing posture of the rules and possible resultant prejudice we suspend the requirements of the rule in this instance as to both parties' filings to date [3] and reach the merits of the parties' arguments.

## SUCCESSFUL PARTY

A.R.S. § 12–341.01 provides that in "any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney's fees." The central issue in this case is whether a party who appeals and succeeds in reversing the trial court's entry of summary judgment is a "successful party" under the statute, thus eligible to recover attorney's fees despite not yet having prevailed on the merits of any of the underlying claims. Plaintiff claims she is a successful party because she succeeded on four of the five issues presented to this court. She argues that entitlement to an

---

ed. No rule permits oral argument prior to a grant of review, but in a few cases this court has *sua sponte* exercised its discretion to suspend the rules and to set oral argument on the question of whether review should be granted. Such cases have invariably been those which involve important issues and in which the question of whether to grant review has been close. We do

not encourage applications to invoke this procedure.

3. Because plaintiff's request for attorney's fees in the court of appeals was clearly untimely—the rule is unambiguous as to appeals—we do not consider the merits of that request.

award for a successful *appeal* does not depend on the eventual outcome of subsequent trial court proceedings and relies on *Wenk v. Horizon Moving & Storage Co., supra,* in which this court held attorney's fees are awardable on appeal under § 12-341.01. In *Wenk* plaintiffs had prevailed at trial but had been denied an attorney's fee award. Plaintiffs appealed the adverse ruling on the fees. From the record we could not determine whether

> the trial court found that appellants: (1) could not recover in contract; (2) could recover in contract but instead found their recovery in tort; or (3) did recover in contract and could have been awarded attorney's fees but were not awarded them within the court's discretion under A.R.S. § 12-341.01(A).

131 Ariz. at 132-33, 639 P.2d at 322-23. We therefore remanded the case, instructing the trial court to clarify the basis for its denial of an award of attorney's fees. 131 Ariz. at 133, 639 P.2d at 323. *Wenk* is not dispositive of the question before us. In that case plaintiffs had already prevailed on the merits, and judgment had been entered in their favor at the trial level. The remand to the trial court for further proceedings was therefore unlike the remand in this case: Wagenseller still faces a trial on the merits.

Defendants argue that plaintiff is not the successful party under § 12-341.01 because she has yet to succeed on the merits of any of her claims. She has merely accomplished reversal of the trial court's entry of summary judgment against her. Defendants rely on *Esmark, Inc. v. McKee,* 118 Ariz. 511, 514, 578 P.2d 190, 193 (App. 1978). *Esmark,,* like *Wenk,* did not address the question before us. In *Esmark* plaintiff was successful in achieving reversal of the summary judgment entered for the defendant. The court of appeals ruled that in light of the outcome of the appeal, the trial court's award of attorney's fees to the defendant was premature: "there is as

yet no successful party *in the action below." Id.* (emphasis supplied). The court did not address the issue of whether plaintiff was the successful party *on appeal,* which is the question we face. In *Huff v. Bekins Moving & Storage Co.,* 145 Ariz. 496, 702 P.2d 1341 (App.1985), the court of appeals found unresolved factual issues and reversed, holding the trial court had improperly granted summary judgment. Without discussion, the court awarded plaintiff attorney's fees in connection with the appeal. 145 Ariz. at 498, 702 P.2d at 1343. Review was not sought.

Thus, this court has yet to consider whether a party who is successful in reversing summary judgment, enabling it to have a trial on the merits, is a "successful party." [1] If the statute expressly defined a successful party we would be bound by the legislative definition. *Serna v. Statewide Contractors, Inc.,* 6 Ariz.App. 12, 15, 429 P.2d 504, 507 (1967). No such specific definition is provided and we are thus faced with the necessity of construing the provision.

1. *Is a Party Who Prevails on an Interim Appeal a "Successful Party" Eligible for Award of Fees?*

A.R.S. § 12-341.01 makes no reference to adjudication on the merits as a prerequisite to recovering attorney's fees as a successful party. *See All American Distributing Co. v. Miller Brewing Co.,* 736 F.2d 530, 532 (9th Cir.1984) (interpreting "prevailing party" for purposes of an attorney's fees award under A.R.S. § 44-1567(A)). By way of contrast, A.R.S. § 12-348 expressly permits fees only to the party "which prevails by an adjudication on the merits." Although this comparison is not conclusive on the question, it hints at its resolution.

Other jurisdictions with similarly worded attorney's fees statutes provide little guidance on the necessity of prior success on the merits under § 12-341.01. *Hanrahan*

---

4. When there are cross-motions for summary judgment at the trial level a different situation is presented. Reversal by the appeals court may mean judgment for the plaintiff. Thus, the suc-

cessful party on appeal is simultaneously the successful party on the merits. *See Winter v. Coor,* 144 Ariz. 56, 65, 695 P.2d 1094, 1103 (1985).

*v. Hampton*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980), appears at first to provide the unequivocal answer to our question. In that case the trial court directed a verdict against plaintiffs on three counts. The court of appeals reversed, remanding the case for a new trial, and awarded plaintiffs costs on appeal, including attorney's fees. The Supreme Court reversed the award of attorney's fees. 446 U.S. at 759, 100 S.Ct. at 1990. It held that because plaintiffs had not yet prevailed on the merits of any of its claims they were not prevailing parties in the sense intended by 42 U.S.C. § 1988 and therefore should be denied attorney's fees. 446 U.S. at 756, 100 S.Ct. at 1989. The basis of the court's construction of "prevailing party" under 42 U.S.C. § 1988 was congressional intent as shown by the statute's legislative reports and history: "[i]t seems apparent from these passages that Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits of at least some of his claims." 446 U.S. at 757–58, 100 S.Ct. at 1989.

In *United States v. 329.73 Acres of Land*, 704 F.2d 800 (5th Cir.1983), "prevailing party" was given a more flexible interpretation when the court found eligibility for attorney's fees did not require a final judgment on the merits. Although the United States had prevailed in its action to condemn defendant's property, the court ruled defendant was the prevailing party for purposes of attorney's fees: defendant had shown "just compensation" to be substantially greater than what the government had previously offered. *Id.* at 808–09. The court defined "prevailing party" differently from *Hanrahan* because the history of the statute establishing the right to fees (42 U.S.C. § 2412) showed different legislative objectives. The court quoted the following from the legislative reports:

Under existing fee-shifting statutes, the definition of prevailing party has been the subject of litigation. It is the committee's intention that the interpretation of the term in S.265 be consistent with the law that has developed under existing statutes. Thus, the phrase "prevail-

ing party" should not be limited to a victor only after an entry of a final judgment following a full trial on the merits. A party may be deemed prevailing if he obtains a favorable settlement of his case ...; if the plaintiff has sought a voluntary dismissal of a groundless complaint, ... on all issues. In cases that are litigated to conclusion, a party may be deemed "prevailing" for purposes of a fee award in a civil action prior to the losing party having exhausted its final appeal. *A fee award may thus be appropriate where the party has prevailed on an interim order ... which was central to the case*, or *where an interlocutory appeal is "sufficiently significant and discrete to be treated as a separate unit."*

*Id.* (emphasis supplied) (quoting, S.Rep. No. 253, 96th Cong., 1st Sess. 7 (1979) and *Van Hoomissen v. Xerox Corp.*, 503 F.2d 1131, 1133 (9th Cir.1974)).

We draw several conclusions from the foregoing. First, the meaning of an ambiguous statutory term with a special legislative history may have little implication for the identical term in a second statute. Second, it appears there is a definite split in the interpretation of terms such as "successful parties" and "prevailing parties." Where the language of the statute is susceptible of more than one interpretation, we must adopt that which is fair, sensible and consistent with the legislatively articulated purpose of the statute and with our general legal principles and prior rulings. *See City of Phoenix v. Superior Court*, 139 Ariz. 175, 178, 677 P.2d 1283, 1286 (1984).

We believe that under A.R.S. § 12–341.01 "successful party" on appeal is not limited to those who have a favorable final judgment at the conclusion of the appeal process. It may include those who achieve reversal of an unfavorable interim order if that order is central to the case and if the appeal process finally determines an issue of law sufficiently significant that the appeal may be considered as a separate

unit. Because Wagenseller's appeal was on an interim order which settled issues of law central to the case, and because it was sufficiently significant to be treated as a separate unit, we find her eligible under the statute for an award of attorney's fees with respect to the favorable outcome of her petition for review before this court.

Our ruling is consistent with *Wenk, supra,* in which we said "who is the 'successful party' is never certain until the appeal process is concluded." Our definition of successful party on appeal also promotes the legislatively articulated objectives of the statute as described above (*supra* at 1046). These include, also, the desire to "mitigate the burden of the expense of litigation to establish a just claim or a just defense." A.R.S. § 12–341.01(B); *see also* Committee on the Judiciary, Minutes of Meeting, *supra*, (proposed section 12–341.-01 is a "client-relief" bill). To establish that she had a tenable legal claim, Wagenseller was constrained to appeal the entry of summary judgment. In successfully doing so, she established important points of law and public policy. The legitimate ends of the statute are served by holding as we do that she is a "successful party" eligible for fees.

## 2. *Are All Successful Parties Entitled to Fee Awards Under § 12–341.01?*

■ Under A.R.S. § 12–341.01 the inquiry as to whether a party should receive a fee award does not stop with a determination of the party's eligibility as a "successful party." The language of the statute makes the permissive nature of the award quite clear:

> In any contested action arising out of a contract, express or implied, the court *may* award the successful party reasonable attorney's fees.

A.R.S. § 12–341.01(A) (emphasis added); *see also Autenreith v. Norville,* 127 Ariz. 442, 444, 622 P.2d 1, 3 (1980). Mere eligibility does not establish entitlement to fees. *Associated Indemnity Corp. v. Warner,* 143 Ariz. 567, 569, 694 P.2d 1181, 1183 (1985). In *Warner* we enumerated six standards to assist the trial judge in determining whether attorney's fees should be granted under the statute, once eligibility has been established. The court should consider:

(1) whether the unsuccessful party's claim or defense was meritorious;

(2) whether the litigation could have been avoided or settled and the successful party's efforts were completely superfluous in achieving the result;

(3) whether assessing fees against the unsuccessful party would cause an extreme hardship;

(4) whether the successful party prevailed with respect to all of the relief sought;

(5) whether the legal question presented was novel and whether such claim or defense have previously been adjudicated in this jurisdiction; and

(6) whether the award would discourage other parties with tenable claims or defenses from litigating or defending legitimate contract issues for fear of incurring liability for substantial amounts of attorney's fees. 143 Ariz. at 570, 694 P.2d at 1184.

■ We believe appellate courts should weigh the same factors in deciding to award fees. Wagenseller's claim presented this court with a novel legal issue. Resolution could not have been achieved without Wagenseller's pursuing the matter through the appeal process. Her legal position was meritorious and her efforts resulted in a change of the law that enables her to pursue her rights either by adjudication or settlement. An award of attorney's fees under the circumstances will encourage parties to seek to have their rights interpreted under the proper law. To deny fees to the successful appellant under these circumstances could well undermine the statute by discouraging meritorious litigants from establishing their "just claim."

We grant plaintiff's request for an allowance of attorney's fees for review proceedings before this court. The amount is to be determined pursuant to Rule 21(c) and

*Schweiger v. China Doll Restaurant, Inc.,* 138 Ariz. 183, 186–88, 673 P.2d 927, 930–32 (App.1983). We grant defendants five days to file objections to plaintiff's itemized statement for services in this court. No fees will be allowed for the proceedings in the court of appeals.

GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.

HOLOHAN, Chief Justice, specially concurring and dissenting.

I concur with the principles set forth in the majority opinion, but I disagree that plaintiff's attorney should be allowed attorney's fees for services on the petition for review.

This is not an instance when counsel was confused about proper procedure. Plaintiff's counsel failed to request attorney's fees in the Court of Appeals in the manner required by Rule 21, Rules of Civil Appellate Procedure. If a timely request for attorney's fees had been made in the Court of Appeals, I could agree that there was diligence by counsel, and the confusion about the manner of applying for fees on review deserved our special consideration. The record in this case does not support our giving any special consideration to counsel. I would deny the request for attorney's fees.